EXHIBIT B

## ASSIGNMENT & TRANSFER FORM

☒ NEW APPOINTMENT          ☐ PROMOTION          ☐ REASSIGNMENT          ☐ TRANSFER

EMPLOYEE  __GIBBON__                    __CLIFTON__                    G.
          Last Name                     First Name                    Middle Initial

---

(Appointments, Promotions & Reassignments Only)

Home Address _____ Street _____ __Flushing, N.Y.__ ____ __11355__
                                    Borough/Town          Zip Code

Home Telephone # _____    Position # _____    $ __15.12 p/hr__
                                                      Rate

---

### NEW ASSIGNMENT

Title  __Assistant City Highway Repairer__ _____ Effective Date __04/09/01__

Responsibility Center __Street & Arterial Maintenance__ Section _____

Immediate Supervisor  Bencivengo _____ ( 718 ) 591 · 7055

Work Location  78-88 Park Drive East, Kew Gardens
               Full Address

| HE02 | | 2165 | 2160 |
|---|---|---|---|
| Payroll Distribution | Soc. Sec. # | Work Unit/Location | Budget Code/Budget Line |

Responsibility Center Manager _____    Deputy Commissioner _____

---

### FORMER ASSIGNMENT (TRANSFERS ONLY)

Responsibility Center _____    Budget Code _____

Immediate Supervisor _____

Work Location: _____
               Full Address

Reason for Transfer _____

Responsibility Center Manager _____    Deputy Commissioner _____

1. New Supervisor
2. Employee
3. Personnel Files
4. Former Supervisor

_Jean Frankowski_ (hh)
Director of Personnel

rev 11/96

1. NEW SUPERVISOR          PER0088

EXHIBIT C

Case 1:07-cv-06698-NRB   Document 5-4   Filed 05/14/2008   Page 4 of 44

```
PQR150                    CITY OF NEW YORK              DATE: 01/02/07
                       PAYROLL MANAGEMENT SYSTEM         TIME: 14:51:14
                      ***  RECORD CHANGE HISTORY  ***

SOC SEC NO: 101 68 4885      EMP NAME:   GIBBON        CLIFTON      G
PAY NO:      841             JOB SEQ#:   1             CURR LV STAT: A
EFF DATE:   01/02/07
                      RSN TYPE
CHG NO   EFF DATE    B T M L X   RSN CD   ----------DESCRIPTION--------- LV STAT
  01    12/10/05            -     O08     TERMINATE NON-PERMANENT          A
  02    03/13/05    - - - - -    A92     LABOR CLASS APPOINTMENT          B
  03    12/12/04            -     O08     TERMINATE NON-PERMANENT          A
  04    06/23/04            -     A96     ERROR CORRECTION                 B
  05    05/03/04    -            G02     WORK UNIT CHANGE                 B
  06    03/14/04    - - - - -    A92     LABOR CLASS APPOINTMENT          B
  07    12/14/03            -     O08     TERMINATE NON-PERMANENT          A
  08    07/23/03    -            X98     BUDGET CHANGE W/IN AGENCY        B
  09    03/16/03    - - - - -    A92     LABOR CLASS APPOINTMENT          B
  10    02/05/03    -            A96     ERROR CORRECTION                 A
  11    12/14/02            -     O08     TERMINATE NON-PERMANENT          A
  12    06/01/02    -            X98     BUDGET CHANGE W/IN AGENCY        B
SELECT CHANGE NO. ==>
PF KEYS: 1-RECORD SEL   2-DATA SEL  3-NOT USED  4-PREV PAGE   5-NEXT PAGE
REASON TYPE LEGEND:    B=BUDGET   T=TITLE   M=METHOD   L=LEAVE   X=TRANSFER
```

Case 1:07-cv-06698-NRB   Document 8-4   Filed 05/14/2008   Page 5 of 44

```
PQR150        ·          CITY OF NEW YORK                DATE: 01/02/07
   ·                 PAYROLL MANAGEMENT SYSTEM            TIME: 14:51:24
                  ***  RECORD CHANGE HISTORY  ***

SOC SEC NO: 101 68 4885        EMP NAME:     GIBBON        CLIFTON      G
PAY NO:       841              JOB SEQ#:     1             CURR LV STAT: A
EFF DATE:     01/02/07

                      RSN TYPE
CHG NO    EFF DATE    B T M L X    RSN CD    ----------DESCRIPTION---------  LV STAT
   01     05/05/02    - - - -       Z99      ERROR CORRECTION CODE               B
   02     03/17/02    - - - -       A92      LABOR CLASS APPOINTMENT             B
   03     12/15/01            -     O08      TERMINATE NON-PERMANENT             A
   04     04/08/01      - - -       A92      LABOR CLASS APPOINTMENT             B
          04/08/01            -     Z98      CITY START DATE CHANGE              B




SELECT CHANGE NO. ==>
PF KEYS: 1-RECORD SEL    2-DATA SEL  3-NOT USED  4-PREV  PAGE    5-NEXT PAGE
REASON TYPE LEGEND:    B=BUDGET    T=TITLE    M=METHOD    L=LEAVE    X=TRANSFER
```

EXHIBIT D

## Memorandum of Agreement
### Seasonal Appointments to ACHR Positions

Memorandum of Agreement (the "Agreement") entered into this _16_ day of _December_, 199_7_, by and between District Council 37, American Federation of State, County, and Municipal Employees, AFL-CIO on behalf of its affiliated Local 983 (the "Union"); and The City of New York (the "Employer").

## WHEREAS

**WHEREAS**, the New York City Department of Transportation ("DOT") desires to make seasonal appointments to the title of Assistant City Highway Repairer ("ACHR") for the period of the highway paving season which is chargeable to the City's Capital Budget ("IFA paving season"); and

**WHEREAS**, the Employer and the Union have reached certain understandings and agreements and wish to reduce the results thereof to writing;

**NOW, THEREFORE**, it is mutually agreed as follows:

§1.    This Agreement shall be limited to employees who during the term of this Agreement are appointed on a seasonal basis to the title of ACHR.

§2.    **Extended Health Plan Coverage**:

   a.    During the term of this Agreement, ACHRs who are appointed to seasonal positions for the IFA paving season and who are terminated at the end of the season because of the conclusion of their seasonal appointment, shall be entitled to continued basic health plan coverage for a period not to exceed ninety (90) days commencing the day after the date of their termination, provided that they were covered under the New York City Employee Health Benefits Program on the date of such seasonal termination. Such continued basic health plan coverage shall be contingent upon the funding provisions set forth in 2(b).

   b.    Effective with the calendar year 2000 paving season, the continued basic off-season health plan coverage set forth in §2(a) shall be funded by pro-rata deductions from the paychecks of the enrolled seasonal ACHRs who work during the IFA paving season. The amount of the additional pro-rata deductions shall be determined by the health plan selected by the individual employee. It is understood that the ACHR is solely responsible for the entire cost of the off-season health plan coverage and any future increases in the cost of the coverage. The premiums for the estimated seven bi-weekly pay periods of off-season health plan coverage shall be pro-rated over the remaining nineteen bi-weekly pay periods.

EOC00070

3. a.    Seasonal ACHRs who are terminated at the end of the IFA paving season shall have preference over new hires in filling vacancies to seasonal positions in the next IFA paving season. Seasonal ACHRs shall have preference in filling full-time ACHR and Debris Remover positions in DOT. Any ACHR who has been seasonally employed for five (5) successive IFA paving seasons shall be converted full-time status in the ACHR title either at the beginning of the next successive IFA paving season or, if originally appointed after July 1st, on the employee's anniversary date in the next successive IFA paving season.

   b.    ACHRs, on the date of their termination, shall receive, in a lump sum, the cash value of any annual or non-FLSA compensatory leave balances remaining on the date of their termination.

4    Right of Review:

    a.    First Season Employees:

        i.    For purposes of this Agreement, the first season of seasonal service shall be deemed a probationary period.

        ii.    At anytime during, or at the end of the IFA paving season, DOT shall notify in writing any seasonal employee whose service during his/her first season has been found to be unsatisfactory.

        iii.    Any seasonal whose service during his/her first season has been found to be unsatisfactory shall be ineligible for future appointment to a seasonal position.

        iv.    Seasonal employees whose service during their first season has been found to be unsatisfactory shall be ineligible to receive the continued basic health care benefits and instead shall receive, in a lump sum, any annual leave or non-FLSA compensatory leave balances remaining on the date of their termination.

        v.    A review of the determination that an employee's service was unsatisfactory may be requested in writing by the employee or the employee's representative within one week of the employee's receipt of the notice.  The decision of the DOT Commissioner or the Commissioner's designated representative shall be final, binding, and not subject to the grievance procedure or arbitration.

    b.    Employees With Less Than Three Years of Seasonal Service:

In any case involving an employee who has not completed three (3) *consecutive* seasons but has completed more than one (1) year of consecutive seasonal service, and who has had written charges of incompetency or misconduct served upon him or her the following procedure shall govern:

**STEP A**    Following the service of written charges, a conference with such employee shall be held with respect to such charges by the person designated by the DOT Commissioner to review grievances at Step I of the Grievance Procedure.  The employee may be represented at such conference by a representative of the Union.  The person designated by the Commissioner to review the charges shall take any steps necessary to a proper disposition of the charges and shall issue a decision in writing by the end of the fifth day following the date of the conference.

**STEP B**    If the employee is not satisfied with the determination at STEP A above, an appeal from such decision shall be made to the DOT Commissioner or the Commissioner's designated representative.  The appeal must be made in writing within five (5) working days of the receipt of the decision.  The Commissioner or the Commissioner's representative shall meet with the employee and the Union for review of the appeal and shall issue a decision in writing by the end of the tenth (10) working day following the day on which the appeal was filed.  The Commissioner or the Commissioner's representative shall have the power to impose the disciplinary penalty, if any, decided upon, up to and including termination of employment.

EOC00071

**STEP C**    If the employee is not satisfied with the decision at STEP B above, the *Union* may appeal to the Commissioner of Labor Relations in writing within ten (10) working days of the determination of the DOT Commissioner or the DOT Commissioner's designated representative.  The Commissioner of Labor Relations or the Commissioner's designated representative shall review the appeal and issue a written reply to the Union which shall be final, binding, and not subject to the grievance procedure or arbitration.

c.    **Employees With More Than Three Years of Seasonal Service:**

In any case involving an employee who has been employed for at least three (3) consecutive seasons as a seasonal ACHR and who has had written charges of incompetency or misconduct served upon him or her the following procedure shall govern:

**STEP A**    Following the service of written charges, a conference with such employee shall be held with respect to such charges by the person designated by the DOT Commissioner to review grievances at Step I of the Grievance Procedure. The employee may be represented at such conference by a representative of the Union. The person designated by the Commissioner to review the charges shall take any steps necessary to a proper disposition of the charges and shall issue a decision in writing by the end of the fifth day following the date of the conference.

**STEP B**    If the employee is not satisfied with the determination at STEP A above, an appeal from such decision shall be made to the DOT Commissioner or the Commissioner's designated representative. The appeal must be made in writing within five (5) working days of the receipt of the decision. The Commissioner or the Commissioner's representative shall meet with the employee and the Union for review of the appeal and shall issue a decision in writing by the end of the tenth (10) working day following the day on which the appeal was filed. The Commissioner or the Commissioner's representative shall have the power to impose the disciplinary penalty, if any, decided upon, up to and including termination of employment.

**STEP C**    If the employee is not satisfied with the decision at STEP B above, the employee or the Union may appeal to the Commissioner of Labor Relations in writing within ten (10) working days of the decision of the DOT Commissioner or the DOT Commissioner's designated representative. The Commissioner of Labor Relations or the Commissioner's designated representative shall issue a decision in writing within fifteen (15) working days of the receipt of the appeal.

**STEP D**    If the employee is not satisfied with the decision of the Commissioner of Labor Relations the *Union* with the consent of the employee may proceed to arbitration pursuant to the and procedures of the Office of Collective Bargaining.

d.    The provisions set forth in this Section 4 shall apply solely to ACHRs appointed as seasonal employees during the IFA paving season. Rights granted pursuant to these provisions shall be limited to an employee's status as a seasonal appointee as set forth in this Agreement and neither add to or subtract from any other rights to which such employee may be entitled.

5.    For the purpose of the job security provisions of the 1990-92 Citywide Agreement or successor agreements thereto, seasonal ACHRs shall be deemed to be "probationary employees."

EOC00072

6.    **Labor Management Committee:**

a.    A labor/management committee shall be established to resolve implementation issues and to monitor compliance with this Agreement.

b.    The parties agree to refer the discussion of procedures for reassignment and transfers to the labor/management committee.

7.    The parties agree that all provisions of the respective collective bargaining agreements remain in effect except as modified by this Agreement.

8.    If any of the provisions of this Agreement are found to be in conflict with the civil service law, or any other applicable rules and regulations, it is understood by the parties that civil service law, or the applicable rules and regulations, shall govern. Such conflict shall not impair the validity and enforceability of the remaining provisions of this letter agreement.

9.    Nothing contained herein shall limit or diminish the Employer's or the Union's rights pursuant to 12-307(b) of the New York City Collective Bargaining Law, except as specifically provided herein.

10.   The provisions of this Agreement may be modified by the mutual written consent of the

EOC00073

parties.

11.    This Agreement shall be deemed an appendix to the 1995-2000 Blue Collar Agreement pursuant to Article XIII thereof, and to shall be coterminous with said agreement.

**WHEREAS,** we have hereunto set our hands and seals this _16_ day of _December_ , 199 _9_.

**FOR THE CITY OF NEW YORK:**                    **FOR THE UNION:**

By: _James F. Hanley_                    By: _Lee Saunders_

JAMES F. HANLEY                    LEE SAUNDERS

Commissioner of Labor Relations                    Executive Director, DC 37 AFSCME, AFL-CIO

By: _Denyse Sullivan_

EXHIBIT E

LABOR - XI                                                        CODE NO.  90692

# ASSISTANT CITY HIGHWAY REPAIRER

## General Statement of Duties and Responsibilities

Under close supervision, assists in highway repair work;  performs related work.

## Examples of Typical Tasks

Performs general laboring tasks while assisting in the repair of curbs, sidewalks, and manhole edges and in the replacement of defective patches.

Performs such tasks as carrying of cement bags, shoveling of sand  and/or  stone, and mixing of materials while assisting in the laying of concrete;  sheet asphalt and other kinds of pavement.

Cleans construction and repair sites by the sweeping and removal of debris.

Performs general laboring tasks while assisting in foundation laying, and in the installation of shoring and sheeting for road depressions and excavations.

Assists in the operation of portable or towed power equipment and attachments required for maintenance operations.

Lays out and cares for tools required for maintenance and repair operations.

Assists in the loading and unloading of materials, equipment and other items.

Assists in the performance of general laboring work, such as snow removal, when weather conditions do not permit paving operations.

R  04.03.1991                        PAGE  1  OF  3

LABOR - XI                                      CODE NO.  90692

## ASSISTANT CITY HIGHWAY REPAIRER  (continued)

### Examples of Typical Tasks  (continued)

Assists in general vehicle maintenance which includes checks of oil and fuel levels, lights, horns and brakes;  cleans interior and exterior of vehicles when required.

Performs general laboring tasks as directed by the supervisor.

May assist in masonry work by the placing of forms during sidewalk and other concrete construction and repair work.

May use picks  and/or  other equipment in the cleaning and preparing of defective areas for patching.

May operate a motorized vehicle in maintenance operations.

May be required to safely direct traffic around large construction projects.


### Qualification  Requirements

1.      There are no formal education or experience requirements for this position.

2.      There are certain medical and physical requirements.

R  04.03.1991                    PAGE  2  OF  3

LABOR - XI                                      CODE NO.  90692

### ASSISTANT CITY HIGHWAY REPAIRER  (continued)


#### License Requirement

A Driver License valid in the State of New York is required at the time of appointment. A Class B Commercial Driver License is required within ninety days of the date of appointment.  There may be certain age requirements to obtain this license.


#### Lines of Promotion

**None.**        This class of positions is classified in the Labor Class.


R  04.03.1991                    PAGE  3  OF  3

EXHIBIT F

**NEW YORK CITY DEPARTMENT OF TRANSPORTATION
CONTROLLED SUBSTANCE AND ALCOHOL ABUSE POLICY FOR
HOLDERS OF A COMMERCIAL DRIVER'S LICENSE ("CDL")**

**REVISED SEPTEMBER 23, 2004**

**THIS POLICY SUPERSEDES ALL PREVIOUS DRUG AND ALCOHOL
TESTING POLICIES.**

## I.

## PROGRAM OVERVIEW

The New York City Department of Transportation ("DOT") is dedicated to providing a safe working environment for its employees and to improve the safety of the public that it serves. In meeting these goals, it is DOT's policy to (1) take steps to ensure that employees are not impaired in their ability to perform assigned duties in a safe, productive, and healthful manner; (2) create a workplace environment free from the adverse effects of drug and alcohol use; (3) prohibit the unlawful manufacture, distribution, dispensing, possession, or use of controlled substances; and (4) alert employees about programs available for employees whose personal problems, including alcohol or drug dependence, adversely affect their ability to perform their duties. This DOT Controlled Substance and Alcohol Abuse Policy Statement is based on the requirements of the U.S. Department of Transportation (USDOT) and the Federal Motor Carrier Safety Administration (FMCSA).

In response to passage of the Omnibus Transportation Employee Testing Act of 1991 the FMCSA has published regulations prohibiting drug use and alcohol misuse by employees (hereinafter referred to as "covered employees") who hold a **commercial driver's license ("CDL")** and perform safety-sensitive tasks as part of their routine and emergency duties and requiring employers of covered employees to test for prohibited drug use and alcohol misuse. These regulations are found at 49 CFR Part 382. In addition, the USDOT has issued 49 CFR Part 40, "Procedures for Transportation Workplace Drug and Alcohol Testing Programs", which prescribes testing methods to be followed.

EOC00139

1

## II.

## SAFETY SENSITIVE EMPLOYEES

The FMCSA regulations (49 CFR Part 382.101 et seq.) require drug and alcohol testing of employees who perform safety sensitive functions who: (1) hold a commercial driver's license; **and** (2) are in a job title the specifications of which require the operation of a commercial motor vehicle, which is defined as follows:

> a motor vehicle or combination of motor vehicles used in commerce to transport passengers or property if the vehicle
>
> (1) has a gross combination weight rating of 26,001 or more pounds; or
>
> (2) has a great gross vehicle weight rating of 26,001 or more pounds; or
>
> (3) is designed to transport 16 or more passengers, including the driver; or
>
> (4) is of any size and is used in the transportation of materials found to be hazardous for the purposes of the Federal Materials Transportation Act (49 U.S.C. 5103(b)) and which require the motor vehicle to be placarded under the Hazardous Materials Regulations (49 CFR Part 172, subpart F).

**Safety sensitive functions include job related activities from the time a driver begins to work or is required to be ready to work until the time he or she is relieved from work.**

DOT has determined that the following job titles are safety sensitive under the FMCSA regulations and therefore employees working in these titles ("covered employees") are required to comply with the drug and alcohol testing provisions of the FMCSA:

**Area Supervisor Highway Maintenance, Assistant City Highway Repairer, Auto Mechanic, Auto Mechanic (Diesel), Bricklayer, Bridge Painter, Bridge Repairer and Riveter, Climber and Pruner, Gasoline Roller Engineer, Highway Repairer, Motor Grader Operator, Oiler, Supervisor Bridge Painter, Supervisor Highway Repairer, Supervisor of Mechanics (Mechanical Equipment), Tractor Operator, Traffic Device Maintainer.**

EOC00140

**In addition any DOT employees who are not employed in these titles but, nonetheless, hold a CDL and operate a commercial motor vehicle as part of their work assignments are required to be tested under this policy statement and are defined as covered employees.**

## III.

## PARTICIPATION AS A CONDITION FOR EMPLOYMENT

All covered employees who may perform the above-referenced safety-sensitive functions must participate in the drug and alcohol testing program described in this policy as a condition of employment.

## IV.

## PROHIBITED BEHAVIOR

### A. Drug Use

1.  **Controlled Substances** No covered employee shall report for duty or remain on duty requiring the performance of a safety sensitive function when using any of the following controlled substances: (a) marijuana and its derivatives; (b) cocaine and its derivatives; (c) amphetamines; (d) opiates; and (e) phencyclidine (PCP), except when the use is pursuant to the instructions of a licensed physician who is authorized to prescribe controlled substances and other drugs and has advised the covered employee that the substance will not adversely affect the employee's ability to safely operate a motor vehicle. Covered employees under DOT's policy will have a specimen of their urine tested for the presence of the five (5) controlled substances referenced above under the circumstances described in Part V of this policy statement.

    No covered employee shall report for duty, remain on duty or perform a safety sensitive function, if the employee tests positive or has adulterated or substituted a test specimen for controlled substances or refuses to submit to a drug and/or alcohol test as described in Part IV(C) of this policy statement.

2.  **Legal Drugs** It is always advisable both for the safety of employees and the public for covered employees who take legally prescribed or over the counter drugs to consult with a licensed physician or dentist to determine if the ingestion or injection of such medications will impair their ability to perform safety sensitive functions.

### B. Alcohol Use

1.  Covered employees are prohibited from reporting for duty or remaining on duty while having an alcohol concentration of 0.04 or greater.

3

EOC00141

2.  Covered employees are prohibited from using alcohol while on duty.

3.  Covered employees are prohibited from reporting for duty within four (4) hours after using alcohol.

4.  No covered employee required to take a post accident test as described in Part V of this policy statement shall use alcohol for eight (8) hours following an accident, or until he/she undergoes a post-accident test, whichever occurs first.

5.  A covered employee found to have an alcohol concentration of 0.02 or greater but less than 0.04 shall be removed from duty until the start of the covered employee's next scheduled work period, but not less than 24 hours following the administration of an alcohol test.

## C. Refusal to Take a Drug or Alcohol Test

Pursuant to 49 CFR Parts 40.191 and 40.261 a refusal to take a drug or alcohol test occurs when a covered employee:

1.  fails to appear for a random, reasonable suspicion, post-accident, follow up or return to duty drug or alcohol test within a reasonable time after being directed to do so;

2.  fails to remain at the testing site for a random, reasonable suspicion, post-accident, follow up or return to duty drug or alcohol test until the testing process is complete;

3.  fails to provide a urine specimen for a drug test or breath for an alcohol test;

4.  fails to provide a sufficient amount of urine for drug testing or breath for alcohol testing and it has been determined by the Medical Review Officer ("MRO") that there is no adequate medical explanation for such failure. A valid medical explanation means that a determination has been made after the individual has been examined by an appropriate medical practitioner approved by DOT's MRO and the MRO provides a written conclusion that the inability to provide an adequate urine or breath specimen could, with a high probability, be due to a medical condition;

5.  fails to undergo a required medical examination or evaluation to determine if an employee has an adequate medical explanation as defined above;

6.  in the case of a directly observed or monitored drug test collection fails to permit the observation or monitoring of the provision of a specimen;

7.  in the case of a drug test fails or declines to take an additional drug test that DOT or the collector has directed him/her to take;

EOC00142

4

8.  in the case of an alcohol test fails to sign the certification at Step 2 of the Alcohol Testing Form;

9.  fails to cooperate with any part of the drug or alcohol testing process which shall include, but is not limited to, adulterating a specimen or substituting a specimen.

If any of the above occurs, the individual will be removed from duty and may be suspended, terminated or referred to a Substance Abuse Professional ("SAP") (see Part VII of this policy statement). **A refusal to test shall be deemed a positive drug and/or alcohol test result.**

## V.

## CIRCUMSTANCES FOR TESTING

Covered employees are subject to pre-employment, reasonable cause/suspicion, post-accident and random testing and, where applicable (see Part VII), return to duty and follow up testing. All testing requirements must meet the standards as outlined in the appropriate regulations. **Covered employees will be required to remain at the testing site beyond the scheduled end of their shifts in order to complete the testing process if necessary.**

### 1. Pre-Employment Drug Testing

a)  An applicant for a position requiring the possession of a CDL will not be hired by DOT unless the applicant takes a drug test with a verified negative result.

b)  An employee may not transfer from a non-safety-sensitive function to a position requiring the possession of a CDL until the employee takes a drug test with a verified negative result.

c)  If an applicant's/transferee's drug test is canceled through no fault of the applicant/transferee, the applicant/transferee is required to take a re-scheduled pre-employment drug test.

### 2. Reasonable Cause/Suspicion Testing

a)  Both drug and alcohol tests shall be conducted when there is reasonable cause/suspicion to believe that a covered employee exhibits symptoms of having used a prohibited drug and/or engaged in the misuse of alcohol.

b)  DOT's determination that reasonable suspicion exists shall be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech, performance indicators, or body odors of the covered employee made by a supervisor or DOT official who has received training pursuant to 49 CFR Part 382.603. **Supervisors, or other DOT officials who have received training pursuant to 49 CFR Part 382.603, are instructed, upon discovering or**

5

EOC00143

receiving credible information that a covered employee is engaged in behavior prohibited under this policy (See Part IV of this policy), to ensure observations are made of the affected employee to determine whether the employee is exhibiting behavior consistent with drug use or alcohol abuse.

c)    An alcohol test based on reasonable suspicion may be administered when said suspicion occurs while a covered employee is performing safety sensitive functions, before the employee may be called upon to perform a safety sensitive function or just after the employee has ceased performing such functions.

d)    A reasonable suspicion drug test may be conducted any time while a covered employee is on duty.

## 3. Post-Accident Testing

a)    *Fatal Accidents:* As soon as practicable following an accident involving a commercial motor vehicle, DOT shall administer drug and alcohol tests to each of its surviving drivers involved in the accident if the accident involved the loss of human life.

b)    *Non-Fatal Accidents:* As soon as practicable following an accident involving a commercial motor vehicle, DOT shall administer drug and alcohol tests to each of its drivers who were performing safety sensitive functions and received a citation for a moving traffic violation arising from the accident if the accident involved: (1) bodily injury to any person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or (2) one or more of the vehicles incurred disabling damage as a result of the accident, requiring the motor vehicle to be transported away from the scene by a tow truck or other motor vehicle. **The citation must have been received within eight (8) hours of the occurrence for the purpose of alcohol testing and within 32 hours following the occurrence for the purposes of drug testing. DOT shall make reasonable efforts to administer the drug and alcohol tests immediately following the issuance of a citation for a moving traffic violation.**

c)    DOT shall ensure that a covered employee required to be drug and alcohol tested under this section is tested as soon as practicable but no later than eight (8) hours after the accident for alcohol and no later than 32 hours after the accident for drugs.

d)    A covered employee who is subject to post-accident testing who fails to remain readily available for such testing, including notifying the employer or the employer representative of his or her location if he or she leaves the scene of the accident prior to submission to such test, may be deemed to have refused to submit to testing.

e)    Nothing in this section shall be construed to require the delay of necessary medical attention for the injured following an accident or to prohibit a covered

6    EOC00144

employee from leaving the scene of an accident for the period necessary to obtain assistance in responding to the accident or to obtain necessary emergency medical care.

## 4. Random Testing

a)   Covered employees will be, at various times, randomly selected for unannounced drug and alcohol testing.  Such testing may be conducted at the beginning of, during, or after a covered employee's work shift.

b)   The dates for administering unannounced testing of randomly selected employees will be spread reasonably throughout the calendar year.

c)   Each covered employee will be in a pool from which random selection is made.

d)   Each covered employee in the pool shall have an equal chance of selection and will remain in the pool, whether or not the employee is ever tested.

e)   A covered employee may be randomly tested for alcohol while the employee is performing safety sensitive functions, before the employee may be called upon to perform a safety sensitive function, or just after the employee has ceased performing such functions.

f)   A covered employee may be randomly tested for drugs any time the employee is on duty.

g)   The number of random drug and alcohol tests administered on an annual basis shall be equal to 100% of the number of covered employees in the random drug and alcohol testing pool.

## 5. Return to duty testing

If required under this policy (see Part VII), before returning to duty each covered employee who has received a verified positive drug or alcohol test result must do the following:

a)   Be evaluated by DOT's designated certified Substance Abuse Professional ("SAP") and comply with the SAP's recommendations and/or requirements, including participation in any rehabilitation program or other treatment, as deemed appropriate by the SAP;

b)   Have a negative drug test result and/or an alcohol test result with an alcohol concentration of less than 0.02 after notification by the SAP to DOT's Designated Employer Representative ("DER") that the covered employee has successfully complied with the recommended treatment and rehabilitation program.

EOC00145

7

**6. Follow-up testing**

Each covered employee who returns to duty after a required evaluation (see Part VII (4)) made by the SAP is subject to unannounced follow-up drug and/or alcohol testing. The designated SAP will determine the frequency and duration of follow-up testing. The covered employee will be required to take a minimum of six follow-up drug and/or alcohol tests with verified negative results during the first 12 months. After that period of time, the designated SAP will recommend the frequency and duration of follow-up drug and/or alcohol testing, provided that the follow-up testing period ends 60 months after the employee returns to duty. This testing shall be in addition to any random drug or alcohol testing.

## VI.

## TESTING PROCEDURES

All drug testing under this policy shall be conducted in a manner to ensure a high degree of accuracy and reliability and using techniques, equipment, and laboratory facilities that have been approved by the U.S. Department of Health and Human Services (DHHS). All testing will be conducted consistent with the procedures put forth in 49 CFR Part 40, as amended and shall include specimen validity testing.

Specimen validity testing is the evaluation of the specimen to determine if it is consistent with normal human urine. The purpose of validity testing is to determine whether certain adulterants or foreign substances were added to the urine, if the urine was diluted, or if the specimen was substituted.

The drugs that will be tested for include marijuana, cocaine, opiates, amphetamines, and phencyclidine. An initial drug screen will be conducted on each urine specimen. For those specimens that are not negative, a confirmatory Gas Chromatography/Mass Spectometry (GC/MS) test will be performed. The test will be considered positive if the amounts present are above the minimum thresholds established in 49 CFR Part 40, as amended.

All drug testing laboratory results will only be released to and reviewed by a qualified Medical Review Officer (MRO) in order to verify and validate test results. The MRO will release findings only to DOT's Designated Employer Representative (DER). The MRO shall be a licensed physician who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's confirmed positive test result. Before verifying that a covered employee has a positive test result, the MRO is responsible for contacting any such employee, on a direct and confidential basis, to determine whether the employee wishes to discuss the test or present a legitimate explanation for the positive result. An MRO staff person may make the initial contact. If, after reasonable efforts, the MRO is unable to reach the covered employee directly, the MRO may contact DOT's DER for assistance in contacting the employee. DOT's DER will take precautions to preserve the confidentiality to the MRO contact.

EOC00146

If, after making diligent and reasonable efforts, neither the MRO nor DOT's DER are able to contact the employee within ten (10) days of the date the MRO received the confirmed positive test result from the laboratory, the MRO may verify the test result as positive. The MRO may also verify the test result as positive if the employee does not contact the MRO within three (3) days of being contacted by DOT's DER or the employee expressly declines the opportunity to discuss the test result. The MRO may reopen the verification of a positive test if the employee presents documentation of serious injury or illness or other circumstances that unavoidably prevented the employee from being contacted within the designated time period, and if the employee then presents a legitimate (in the MRO's opinion) explanation for the positive test, the MRO shall declare the test to be negative.

The MRO will review and interpret an individual's medical history, including any medical records and biomedical information provided; afford the individual an opportunity to discuss the test result; and decide whether there is a legitimate medical explanation for the result, including legally prescribed medication.

The MRO can declare a test invalid or canceled based on the regulations specified in 49 CFR Part 40. A canceled/invalid test is considered neither a positive nor a negative test. An example of a canceled test is a urine sample being rejected by the laboratory. The MRO shall cancel the test and report the cancellation and the reasons for it to the FMCSA, DOT and the employee. A negative dilute specimen will require a retest.

If the MRO determines that an employee adulterated a specimen or provided a substitute specimen, the employee will be deemed to have refused to have taken the test and will be subject to the consequences described in Part VII of this policy statement.

Tests for breath alcohol concentration will be conducted utilizing a National Highway Traffic Safety Administration (NHTSA) approved evidential breath-testing device (EBT) operated by a trained breath alcohol technician (BAT).

All breath alcohol test results will be reported only by an MRO or BAT to DOT's Designated Employer Representative (DER). If the initial test indicates an alcohol concentration of 0.02 or greater, a second test will be performed to confirm the results of the initial test.

**A covered employee who has a confirmed alcohol concentration of greater than 0.02 but less than 0.04 will be removed from his/her position until the start of the covered employee's next scheduled work period, but not less than 24 hours following the administration of the alcohol test.**

An alcohol concentration of 0.04 or greater will be considered a positive alcohol test and in violation of this policy and a violation of the requirements set forth in 49 CFR Part 382 for safety sensitive employees.

EOC00147

Upon notification from the MRO that a covered employee has tested positive for drugs and/or alcohol, DOT shall immediately remove said employee from duty and shall seek the termination of said employee after a first positive result except for an employee in a job title described in Section VII (3) of this policy statement.

## Split Specimen Testing

A covered employee who questions the results of a required drug test under Part V of this policy may request that an additional test be conducted. This test must be conducted at a different DHHS-certified laboratory. The test must be conducted on the split sample that was provided by the employee at the same time as the original sample. All costs for such testing are paid by the employee unless the result of the split sample testing invalidates the result of the original test. The method of collecting, storing, and testing the split sample will be consistent with the procedures set forth in 49 CFR Part 40, as amended. **The employee's request for a split sample test must be made to the MRO within 72 hours of notice of the original sample verified test result. Requests made after 72 hours will only be accepted if the delay was due to documentable facts that were beyond the control of the employee.**

## VII.

## CONSEQUENCES OF THE USE OF DRUGS AND MISUSE OF ALCOHOL

1. If a covered employee has a verified positive drug test, or has a confirmed alcohol concentration of 0.04 or greater, or refuses to take a drug or alcohol test, the employee will immediately be removed from duty.

2. **Zero Tolerance Policy:** DOT shall seek the termination of **any** covered employee in the following job titles that require the possession of a CDL as a condition of employment, or who holds a CDL and operates a commercial motor vehicle, who receives a verified positive drug or alcohol test result.

**Auto Mechanic; Auto Mechanic (Diesel); Bricklayer; Bridge Painter; Bridge Repairer and Riveter; Gasoline Roller Engineer; Motor Grader Operator; Oiler; Supervisor Bridge Painter; Supervisor of Mechanics (Mechanical Equipment); Tractor Operator.** [1]

**This policy shall also apply to any DOT employees who are not employed in these titles but, nonetheless hold a CDL, and operate a commercial motor vehicle and are not covered by the Collective Bargaining Agreement between District Council 37 and the City of New York.**

A positive result shall include a refusal to test as defined under Part IV of this policy statement.

---

[1] Employees in these job titles are not covered by the City's Collective Bargaining Agreement with District Council 37 and are thus subject to termination after a positive drug or alcohol test.

EOC00148

Termination shall be sought pursuant to the procedural requirements of Section 75 of the New York State Civil Service Law and/or of the relevant collective bargaining agreement, where applicable.  However, for probationary employees, provisional employees who have been employed for less than two years, provisional employees who are not covered by a collective bargaining agreement that contains disciplinary appeal rights and any other employees who do not have disciplinary appeal rights under Section 75 of the New York State Civil Service Law and/ or a collective bargaining agreement who are employed in the above job titles, termination shall be effective upon written notification by DOT after a verified positive drug and/or alcohol test.  Covered employees terminated after a first time verified positive drug or alcohol test result shall not be referred by DOT to a DOT designated certified SAP or any other rehabilitation program and shall not be eligible for reinstatement. Upon termination, the employee will be notified of programs that address drug and alcohol addictions which the individual may contact at his/her own convenience.

3.    DOT shall seek the termination of any employee in the following job titles that require the possession of a CDL who receives a second verified positive drug and/or alcohol test result:[2]

**Area Supervisor Highway Maintenance; Assistant City Highway Repairer; Climber and Pruner; Highway Repairer; Supervisor Highway Repairer; Traffic Device Maintainer.**

**This policy shall also apply to any DOT employees who are not employed in these titles but, nonetheless hold a CDL, and operate a commercial motor vehicle and are covered by the Collective Bargaining Agreement between District Council 37 and the City of New York.**

A positive result shall include a refusal to test as defined under Part IV of this policy statement.

Termination shall be sought pursuant to the procedural requirements set forth in paragraph two (2) of this Part.

4.    Covered employees listed in paragraph three (3) of this Part who receive a first time positive drug and/or alcohol test result shall, except in compelling circumstances as determined by DOT, be offered the opportunity to participate in a substance abuse drug and alcohol counseling program.  Employees who accept the offer will be referred to a designated certified SAP after a first time positive result for evaluation.  The SAP will determine whether the employee is in need of assistance in resolving problems associated with drug use or misuse of alcohol. The SAP will also inform the employee of additional resources available for resolving problems associated with prohibited drug use and misuse of alcohol.

---

[2] The employees listed in this paragraph are covered by the collective bargaining agreement referenced in footnote 1.

EOC00149

5.  DOT shall seek the termination of covered employees that either refuse the offer to participate in a substance abuse counseling and treatment program or where DOT makes a determination that there are compelling circumstances not to offer a covered employee this opportunity. Termination shall be sought pursuant to the procedural requirements set forth in paragraph two (2) of this Part.

6.  Covered employees who are referred to a designated certified SAP shall comply with all treatment programs prescribed by the SAP before DOT shall consider permitting the employee to return to duty. If the SAP determines that the employee has successfully completed his/her treatment program and is fit to return to duty, DOT shall administer a return to duty drug and/or alcohol test. Only if the employee receives a verified negative drug test and/or alcohol test showing an alcohol concentration of below 0.02 shall DOT permit the employee to return to duty. In cases where the employee has not completed his/her treatment program but where the SAP has determined that said employee is in compliance with his/her treatment program and is fit to return to duty, DOT may permit the employee to return to duty upon receipt of a verified negative return to duty drug test and/or alcohol test result showing an alcohol concentration of below 0.02. Should such an employee, upon return to duty, fall out of compliance with his/her treatment program, DOT shall seek the employee's termination in accordance with the procedures set forth in paragraph two (2) of this part.

7.  Once a covered employee receives a negative drug and/ or alcohol return to duty test result, said employee shall be subject to at least 6 unannounced follow up drug and/ or alcohol tests within the first 12 months following the employee's return to duty. This testing shall be in addition to random drug and alcohol testing.

8.  <u>No provision in this policy statement shall preclude DOT from disciplining a covered employee listed under paragraph three (3) of this part in accordance with the procedural requirements set forth under paragraph two (2) of this Part, except that termination shall not be sought after a first time positive drug and/or alcohol test result for said employees absent compelling circumstances.</u>

## VIII.

## SIGNS AND EFFECTS OF ALCOHOL AND SUBSTANCE ABUSE

Substance abuse is the use of any chemical substance, legal or illegal, to the point that it produces physical, mental, emotional, and/or behavioral changes in the user. All controlled substances and non-prescription drugs chemically alter the mind, body functions, and motor skills, hindering judgment, perception, reaction time and all the other skills needed to perform safety-sensitive functions.

12

EOC00150

## ALCOHOL

Alcohol is a depressant and is considered a drug even though it is legal and publicly accepted. It is the most commonly abused drug and a major factor in at least 50 percent of all traffic fatalities.

## SIGNS

Slurred speech, glazed appearance of eyes, flushed skin, slowed reaction time, poor balance and odor on breath are all signs of alcohol use.

## EFFECTS

Alcohol slows down the central nervous system and brain functions, reduces coordination and reflex actions and impairs vision and perspective. While under the influence of alcohol, an individual's emotions can be distorted and intensified, leading to extreme reactions and loss of control.

## MARIJUANA

Marijuana is an illegal substance used for its intoxicating effects.

## SIGNS

Appearance of intoxication, bloodshot eyes, inability to maintain attention, and impaired time and distance perception are signs of marijuana use..

## EFFECTS

The use of marijuana can decrease motor skills and reaction time by up to 60 percent. An individual's thinking and reflexes are slowed, making it difficult to respond quickly to sudden or unexpected events. Marijuana can remain in the body for weeks.

## COCAINE

Cocaine, including "crack" cocaine, is a powerful stimulant and the most widely abused drug. It is an addictive drug leading to physical and psychological dependence.

## SIGNS

Extreme excitability, uncontrolled talkativeness and anxiety, dilated pupils, sniffles or runny nose, and paranoia are all signs of cocaine use.

EOC00151

13

## EFFECTS

The use of cocaine impairs motor coordination, vision and judgment. An individual under the influence of cocaine may overreact to minor traffic events or become overly confident and take inappropriate risks because of the user's inability to perceive danger.

## OPIATES

Narcotic analgesics are most commonly used medically to relieve pain. This group of drugs includes heroin, morphine, opium, codeine, methadone and meperidine.

## SIGNS

Drowsiness, constricted pupils, depressed reflexes, and poor coordination are signs of opiate use.

## EFFECTS

Use of opiates slows down the central nervous system and brain functions, reduces coordination and reflex actions and impairs vision and perspective. A user experiences a dream-like state of mind causing the individual to be inattentive and unable to react quickly.

## PHENCYCLIDINE (PCP/ANGEL DUST)

PCP is a synthetic drug once used by veterinarians, now illegally used as a hallucinogen.

## SIGNS

Signs of PCP use are extreme agitation, great physical strength, sweating, dizziness, confusion, loss of memory, hallucinations, and distortion of spatial distances.

## EFFECTS

A user of this drug is extremely dangerous on the road. The effects of this drug are varied; a user experiences a sense of power which may cause the user to take dangerous risks. The user becomes aggressive, hostile and fearless, even of death. Not only is vision impaired but auditory or visual hallucinations causing reaction to an event that is not occurring may be experienced.

## AMPHETAMINES

Amphetamines are a group of drugs that stimulate the central nervous system, increasing alertness and physical activity. Statistics show that drivers who use stimulants are more accident-prone.

EOC00152

*SIGNS*

Irritability, anxiety, dilated pupils, sweating, headaches, dizziness, restlessness, feeling of strength, and distorted thinking are signs of amphetamine use.

*EFFECTS*

The use of amphetamines impairs motor coordination, vision and judgment. A user tends to take more risks, may inappropriately increase vehicle speed and react inappropriately to minor irritations.

## IX.

## AGENCY CONTACT PERSONS

DOT employees who have questions regarding DOT's drug and alcohol testing program should contact:

Anna Budd
Designated Employer Representative ("DER")
New York City Department of Transportation
40 Worth Street, Rm. 815
New York, NY 10013
Tel. No.:   (212) 442-7826    Fax: (212) 442-7834  e-mail: ABudd@dot.nyc.gov

Gordon Goldberg
Director of Labor Relations
New York City Department of Transportation
40 Worth Street, Room 810
New York, NY 10013
Tel. No.: (212) 442-1970    Fax: (212) 442-9208  e-mail: GGoldberg@dot.nyc.gov

Patricia Breglio
Director of Policy Analysis and Implementation
New York City Department of Transportation
40 Worth Street, Room 802
New York, NY 10013
Tel. No.: (212) 442-5404    Fax: (212)676-9585  e-mail: PBreglio@dot.nyc.gov

EOC00153

# X.

## DRUG AND ALCOHOL ABUSE COUNSELING

The following programs are available to assist you if you believe that you have a drug and/or alcohol abuse problem:

New York City Employee Assistance Program (EAP)
40 Rector Street, 7th Floor
New York, NY 10006
(212) 306-7660

DC37 Personal Services Unit
125 Barclay Street, Room 301
New York, NY 10007
(212) 815-1250
**(For Employees who are represented by DC37)**

Citywide CDL Employee Assistance Unit
44 Beaver Street
New York, NY 10004
(917) 237-5867

Inter-Group Association of Alcoholics Anonymous of New York, Inc.
307 Seventh Avenue, (West 28th Street), Room 201,
New York, N.Y. 10001-6007
PH: 212-647-1680; 718-515-8481; 914-949-1200
FX: 212-647-1648
Telecom Device For Deaf Only: 212-647-1649
Web Site: http://www.nyintergroup.org/

New York City Area Service Committee (NYCASC) of Narcotics Anonymous
POB #329
70-A Greenwich Avenue
New York, NY 10011
Regional Helpline: (212) 929-NANA (6262)
Web Site: http://www.nycasc.org/

16

EOC00154

EXHIBIT G

# NEW YORK CITY DEPARTMENT OF TRANSPORTATION

## CONFIRMATION OF RECEIPT

## ACKNOWLEDGEMENT

I have received a copy of the Department of Transportation's drug and
alcohol policies and procedures.

_u - a - 01_

**Date**

_C. lifon Qibbon_

**Employee's Signature**

**Employee ID#**

_C. lifon Qibbon_

**Employee's Name**

Please sign and return this document.

pp/drugtest/ackwldg

PER0113

EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CLIFTON GIBBON,

                                Plaintiff,

          -against-

CITY OF NEW YORK,

                            Defendant.
------------------------------------------------------------------------ x

**DECLARATION OF RHAY
SUMLER IN SUPPORT OF
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT**

07 CV 6698 (NRB)

      **RHAY SUMLER** declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct.

      1.     I am Director of Field Operations for the New York City Department of Transportation ("NYCDOT") Drug and Alcohol Testing Program. I have held this position for approximately three years. I am fully familiar with the facts and circumstances set forth herein based upon a review of the books and records of the NYCDOT and conversations with its employees. As such, I submit this declaration in support of the motion by defendant, the City of New York, for Summary Judgment in this action.

      2.     Part of my responsibilities as Director of Field Operations for the NYCDOT is to ensure that our drug tests are conducted pursuant to the Federal Drug testing procedures set forth by the United States Department of Transportation ("U.S. DOT") in 49 CFR Part 40. Moreover, the Drug and Alcohol Testing Program maintains documents and records of individual drug tests, some of which are annexed hereto, in the course of its regularly conducted business activities related to drug testing and which are prepared at or near the time of the occurrence of the matters set forth in them.

3.    On February 15, 2006, I was the Designated Employer Representative ("DER") at 40 Worth Street for the employee drug tests being performed that morning.

4.    Plaintiff, Clifton Gibbon, a Seasonal Assistant City Highway Repairer whose job requires the possession and maintenance of a valid Class B Commercial Drivers License as a condition of employment, was scheduled to receive a pre-employment drug screening that morning prior to being reemployed for the 2006 employment season. His drug test began at approximately 9:18 am. A copy of the tester's statement is annexed hereto as Exhibit "1."

5.    Plaintiff did not make any requests for a new test day or time.

6.    Plaintiff's initial urine sample was less than 45ml and therefore it was insufficient pursuant to 49 CFR § 40.65(a).

7.    Pursuant to 49 CFR § 40.193(b)(1), plaintiff's insufficient urine sample was discarded. Then, pursuant to 49 CFR § 40.193(b)(2), plaintiff was told he had up to three hours to produce a sufficient urine sample.

8.    Plaintiff was given approximately 40 ounces of water and encouraged to drink it. See 49 CFR § 40.193(b)(2).

9.    Plaintiff was allowed to attempt to urinate whenever he wanted; however, he was told not to leave the designated testing area. Plaintiff continued to attempt to provide a sufficient urine sample; however none of his attempts were sufficient. See Exhibit "1;" 49 CFR § 40.65(a); and 49 CFR § 40.193(b)(1).

10.    It was explained to plaintiff that if he could not produce a sufficient urine sample within the three hours he would be referred to a physician for an examination to

determine whether plaintiff had a medical condition which would prevent him from providing a sufficient urine sample in a three hour period.

11.    It was also explained to plaintiff that if there was no adequate medical explanation to preclude him from providing a sufficient urine sample, plaintiff would then be determined to have refused to test, which was equivalent to a positive test and would then result in plaintiff not getting hired. See 49 CFR § 40.193.

12.    The three hour period ended and plaintiff did not yet provide a sufficient urine sample.

13.    Plaintiff was then told to go to a medical facility to be examined by the NYCDOT's drug testing Medical Review Officer ("MRO"). This examination was to evaluate the possible presence of an acceptable alternative medical explanation for plaintiff not providing a sufficient 45ml urine sample in three hours as required by U.S. DOT regulations.

14.    Plaintiff was given directions to Westchester Medical Care. A copy of these directions are annexed hereto as Exhibit "2."

15.    Based on the tests and examination conducted at Westchester Medical Care by the MRO, it was determined that no acceptable alternative medical explanation was discovered for plaintiff not providing a sufficient urine sample in three hours and that, therefore, the test was deemed a refusal to test under the U.S. DOT regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  New York, New York
              May 14, 2008

                                          Rhay Sumler

-3-

Declaration of Rhay Sumler
Exhibit 1

11 West Main St.
Suite 300
Elmsford NY 10523



(914) 593-0300 Ph.
(914) 347-4901 Fax
www.claritytesting.com

## Tester Statement

On 2.15.06, I Lorenzo Robinson was performing Pre-employment Drug Testing for the New York City Department of Transportation on the 8th floor bathroom at 40 Worth Street New York, NY. At 9.18 AM I began a drug test on donor Clifton Gibbons. After confirming Mr. Gibbons ID, and explaining the testing procedures to him, donor was directed to the bathroom to provide a urine sample. Mr. Gibbon made a first attempt however the quantity was insufficient.

I explained to Mr. Gibbons that he was required to remain in the collection area and that he had up to 3 hours to provide a valid sample (45ml). Mr. Gibbons was provided water and subsequently made 2 additional attempts to provide a valid sample, however both were of insufficient quantity and discarded as required on 49 CFR Part 40.

I further explained to Mr. Gibbons that in the event that he was unable to provide a valid sample within a 3 hour starting from the time of his first attempt that he would be referred to a Physician for a medical evaluation to determine if valid medical condition existed that would prevent him providing a valid sample within a 3-hour period. Additionally, I made it clear that if the determination is that a valid medical condition did not exist that this would be a Refusal To Test, which carries the same consequences as a Positive test result. Mr. Gibbons understood what I explained to him and upon surpassing the 3-hour time limit without providing a valid sample he was willing to be evaluated by a Physician.

I communicated all of these details at the time of testing to Rhay Sumler, Designated Employer Representative ("DER") for NYC DOT who was at the testing site.

Lorenzo Robinson:

EOC00133

Declaration of Rhay Sumler
Exhibit 2

02/15/2006  00:46   9143474901   CLARITY TESTING   PAGE  01/03

Page 1 of 3

**Driving Directions from Bayside, NY to 160 S Central Ave, Elmsford, NY**





Control Your
Cravings & Lose
Weight

GLYCEMIC DIET

| Start: | **Bayside, NY 11361, US** |
|---|---|
| End: | **160 S Central Ave**<br>**Elmsford, NY 10523-3509, US** |

Notes:
Fax to 1-212-676-9585

Westchester Medical Care 914-345-3135
(Same parking lot as Teamsters Local 456
bldg). Medical office entrance is at the far
right of bldg.

## Directions

| Directions | Distance |
|---|---|
| **Total Est. Time: 35 minutes**    **Total Est. Distance: 25.58 miles** | |
| **1: Start out going SOUTH on 210TH ST toward 42ND AVE.** | <0.1 miles |
| **2: Turn RIGHT onto 42ND AVE.** | 0.1 miles |
| **3: Turn LEFT onto 208TH ST.** | 0.1 miles |
| **4: Turn RIGHT onto 43RD AVE.** | <0.1 miles |
| **5: Turn RIGHT onto CLEARVIEW EXPY.** | <0.1 miles |
| **6: Merge onto I-295 N via the ramp on the LEFT toward THROGS NECK BR (Portions toll).** | 4.9 miles |
| **7: Merge onto THROGS NECK EXPY / I-695 N via EXIT 10 toward I-95 N / NEW HAVEN.** | 1.6 miles |
| **8: THROGS NECK EXPY / I-695 N becomes I-95 N.** | 1.3 miles |
| **9: Take the HUTCHINSON PKWY NORTH exit- EXIT 9.** | <0.1 miles |
| **10: Merge onto HUTCHINSON RIVER PKWY N via the exit on the LEFT.** | 4.4 miles |
| **11: Merge onto CROSS COUNTY PKWY W via EXIT 13 toward SAW MILL PKWY / YONKERS.** | 1.6 miles |

Driving Directions from Bayside, NY to 160 S Central Ave, Elmsford, NY

**12: Take the BRONX PKWY NORTH exit- EXIT 6- toward SPRAIN PKWY.**     0.4 miles

**13: Merge onto BRONX RIVER PKWY N.**     0.3 miles

**14: Take SPRAIN BROOK PKWY N toward TACONIC PKWY.**     9.0 miles

**15: Merge onto I-287 W / CROSS WESTCHESTER EXPY via the exit on the LEFT toward TAPPAN ZEE BR.**     0.3 miles

**16: Take the RT-9A exit- EXIT 2- toward ELMSFORD.**     0.1 miles

**17: Turn LEFT onto NY-9A / N SAW MILL RIVER RD. Continue to follow NY-9A.**     0.7 miles

**18: End at 160 S Central Ave Elmsford, NY 10523-3509, US**

**Total Est. Time: 35 minutes     Total Est. Distance: 25.58 miles**

## Driving Directions from Bayside, NY to 160 S Central Ave, Elmsford, NY



**Start:**
**Bayside, NY 11361, US**

**End:**
**160 S Central Ave**
**Elmsford, NY 10523-3509, US**




All rights reserved. Use Subject to License/Copyright
These directions are informational only. No representation is made or warranty given as to their content, road
conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no
responsibility for any loss or delay resulting from such use.