UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

CLIFTON GIBBON,

                           Plaintiff,

-against-

CITY OF NEW YORK,

                          Defendant.

------------------------------------------------------------------ x

**DECLARATION OF
ASSISTANT CORPORATION
COUNSEL JASON
FRIEDMAN IN SUPPORT OF
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

07 CV 6698 (NRB)

       **JASON FRIEDMAN** declares, under penalty of perjury and pursuant to 28 U.S.C. § 1746, that the following is true and correct:

       1.      I am an Assistant Corporation Counsel in the Office of Michael A. Cardozo, Corporation Counsel of the City of New York, attorney for the defendant, the City of New York, ("defendant") in the above-captioned action.

       2.      This declaration is based on the books and records of defendant, as well as the transcript of plaintiff's deposition taken in this case. I submit this declaration in support of defendant's motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

       3.      Annexed hereto as Exhibits A through Q are true and correct copies of documents from the books and records of defendant kept in the ordinary course of defendant's business, as well a copy of portions of the transcript of the deposition taken of the plaintiff, Clifton Gibbon ("plaintiff"), in this action, which are relied upon and cited in defendant's Local Civil Rule 56.1 Statement of Undisputed Material Facts and Defendant's Memorandum of Law, submitted herewith in support of defendant's motion. These documents are as follows:

A.    A copy of portions of the transcript of plaintiff's deposition, taken on January 8, 2008, is annexed hereto as Exhibit A.

B.    A copy of plaintiff's Seasonal Assistant City Highway Repairer ("ACHR") Appointment Form, is annexed hereto as Exhibit B.

C.    Plaintiff's NYC Payroll Management System Employee Description and Record Change History Screen Printouts, are annexed hereto as Exhibit C.

D.    A copy of the Seasonal ACHR memorandum of Agreement is annexed hereto as Exhibit D.

E.    A copy of the NYC Department of Citywide Administrative Services ("DCAS") Job Specifications for the ACHR title, is annexed hereto as Exhibit E.

F.    A copy of New York City Department of Transportation ("NYCDOT") Drug Testing Policy, is annexed hereto as Exhibit F.

G.    A copy of plaintiff's acknowledgment of receipt for the NYCDOT drug testing policy, is annexed hereto as Exhibit G.

H.    A copy of the May 14, 2008 Declaration of Rhay Sumler in support of defendant's motion for summary judgment is annexed hereto as Exhibit H.

I.    A copy of plaintiff's examination and urine test results from Westchester Medical Care center, is annexed hereto as Exhibit I.

J.    A copy of Dr. Altholz February 24, 2006 letter is annexed hereto as Exhibit J.

K.    A copy of Jean Frankowski's March 10, 2006 letter is annexed hereto as Exhibit K.

L.    A copy of Dr. Bharara's March 8, 2006 note is annexed hereto as Exhibit L.

M.    A copy of Dr. Bharara's March 22, 2006 note is annexed hereto as Exhibit M.

N.    A copy of Dr. Altholz' March 23, 2006 letter is annexed hereto as Exhibit N.

O.    A copy of Jean Frankowski's March 31, 2006 letter is annexed hereto as Exhibit O.

P.    A copy of Dr. Corujo's, June 16, 2006, medical report is annexed hereto as Exhibit P.

Q.    A copy of plaintiff's Complaint in this action, filed July 25, 2007, is annexed hereto as Exhibit Q.

I declare under penalty of perjury that the foregoing is true and correct.

Executed:    New York, New York
             May 14, 2008

Jason Friedman
Assistant Corporation Counsel
jfriedma@law.nyc.gov

EXHIBIT A

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    --------------------------------------------X
     CLIFTON GIBBON,
3
                                    PLAINTIFF,
4

5              -against-          Case No:
                                  07 CV 6698
6

7    CITY OF NEW YORK,

8                                  DEFENDANT.
     --------------------------------------------X
9

10                      DATE: January 8, 2008

11                      TIME: 10:26 a.m.

12

13

14          EXAMINATION BEFORE TRIAL of the Plaintiff,

15    CLIFTON GIBBON, taken by the Defendant, pursuant to a Notice

16    and to the Federal Rules of Civil Procedure, held at the

17    offices of Special Federal Litigation, New York City Law

18    Department, 100 Church Street, New York, New York 10007-2601,

19    before Shawn McCline, a Notary Public of the State of New

20    York.

21

22

23

24

25

```
 1      A P P E A R A N C E S:

 2


 3      SCHWARTZ, LICHTEN & BRIGHT, P.C.
                    Attorneys for the Plaintiff
 4                  275 Seventh Avenue, 17th Floor
                    New York, New York 10001
 5                  BY: STUART LICHTEN, ESQ.
                    (212) 228-6320
 6


 7
        MICHAEL A. CARDOZO, ESQ.
 8      CORPORATION COUNSEL
        NEW YORK CITY LAW DEPARTMENT
 9                  Attorney for the Defendant
                    100 Church Street
10                  New York, New York 10007-2601
                    BY: JASON FRIEDMAN, ESQ.
11                  File #: 2007-022840
                    Control #: DDD00713
12


13


14      ALSO PRESENT:
                Andrez Carberry, Esq., Assistant Corporation Counsel
15

16

17
                        *           *           *
18

19

20

21

22

23

24

25
```

C. Gibbon

1      A.     The last unemployment I got was in 2005 when I get

2  laid off.

3      Q.     When you got laid off from where?

4      A.     From DOT.

5      Q.     How long did you receive those benefits?

6      A.     For three months.

7      Q.     Now, before 2005, did you receive unemployment

8  benefits?

9      A.     Yes.   In 2004, also, I was with DOT.   I was a

10  seasonal there.   I just work for nine months.   I work for

11  nine months and we get laid off for three, right.   So

12  whenever we get laid off they set it up, the City set it up

13  that we collect the unemployment, right.

14         You can let them take the tax out of the

15  unemployment or you can collect all the unemployment which is

16  $405, right.   And if you don't make them take the tax, at the

17  end of the year when you file your tax, you've got to file

18  that, you understand.   So I got the unemployment 2005, 2004,

19  2003, 2002, 2001 because I've been with DOT now for five

20  years.

21      Q.     Before working for DOT, did you receive

22  unemployment?

23      A.     No.  No.

24      Q.     Have you ever received disability compensation from

25  the government?

C. Gibbon

1    because, you know, some people, you have some contractor, you
2    go to do the job for them, right, they know that that job
3    will cost $100 to do, they want to pay you 25, you know,
4    after they take the other 75 for themselves, you understand,
5    so you've got to know, you know.
6              But anything in the construction field, within that
7    field, and I can get it, I'll do it because right now I'm not
8    working.
9         Q.    Did you do that type of work when you worked for
10   DOT?
11        A.    No.
12        Q.    What kind of work did you do?
13        A.    For DOT, I do -- you mean the work that I do for
14   DOT?
15        Q.    When you were a seasonal road worker, what kind of
16   work did you do?
17        A.    Well, I do guardrail, bulking.  You see the garbage
18   trucks, right.  We go on the highway because we work
19   definitely on the highway.  You ever pass on the highway and
20   see some big black bags on the shoulder of the road, we just
21   drive the truck down that highway and pick up all the bags,
22   or if you see any debris that would let the highway look, you
23   know, untidy, we just clean it up.
24        Q.    Did you drive the truck?
25        A.    Yes, I have a CDL license, a B license.

C. Gibbon

1    guy name Masboo, we work as a team, as a partner.  He was my

2    partner, you know.  And they say we work very good with the

3    trimmings and things.  It's we pull the trimming team.  In

4    other words, we get the job done every season, you know.  So

5    most of the time they put me and Masboo on it because the

6    tractor cannot cut and leave us too far, you understand, you

7    know.

8         Q.    So as a seasonal worker, you start working at what

9    month of the year?

10        A.    March.

11        Q.    Until when?

12        A.    Until maybe when the season finish in December.

13   Maybe they finish either about the 13th of December or the

14   14th or 15th because if the season finish the 15th of

15   December this year, maybe last year it will finish about the

16   13th, so within December you don't have the date.

17        Q.    So from March until December?

18        A.    Yes.

19        Q.    When you would start work, you would have to be

20   rehired, how does that work?

21        A.    No.  Well, as a seasonal, right, you've got to go

22   take your drug test.  The same test that I went and take, the

23   test you go and take, the drug test.

24        Q.    And you did that in 2001, 2002?

25        A.    Every year, come right up to the five years, every

C. Gibbon

1    year I've been doing it, right.  And then you pass the drug

2    test.  You get back a negative response from the drug test

3    that mean you're clean, you don't have any drug in your

4    system.  They give you -- they write a paper to take back to

5    your yard, the yard that you're working in, that is the okay

6    for you to start work.  You take that paper to the DS, that

7    is district superintendent that is in that yard.

8        Q.    Did you in any of those previous years, did you

9    have a problem urinating for the drug test?

10       A.    No, this problem hit me right in 2005.  At the

11   ending of 2005, you know, they just call you randomly, you

12   know, they just, if you go work, you don't know you're going

13   to take a drug test.

14       Q.    It's a random test?

15       A.    You're just in the field, they call you and say

16   come, you're going downtown.  I say.  What am I going

17   downtown for?  They say drug test.  You just left and you

18   just go in and take the drug test and that's it.

19       Q.    So there was no appointment?

20       A.    No, you don't have no appointment.  They call you

21   randomly, man.  They just pick you up out of the field and

22   take you and test you, bam.  That is the way they are.  In

23   the morning, you might go to the yard in the morning, when

24   you look you see the drugs van or the drugs car or, you know,

25   what the people them in, the people -- them who come to test

C. Gibbon

1    you for drugs.  You see them transportation in the yard.

2    Then you know that they come to check this yard.

3              Now, when they come they have a list of names, they

4    just don't check everybody in the yard, them have a list of

5    name them write down and them just call, you know, just check

6    them.  If your name is on the list, you get tested.

7        Q.    So you did the random test in February because?

8        A.    No.

9        Q.    Explain when the test was?

10       A.    When they find out about the prostate?

11       Q.    No, this drug test to become a seasonal road

12   worker?

13       A.    Well, the random test, at first, the drug van used

14   to come in the yard, right.  When the drug van come, the

15   people them on that van, them have a list with the name of

16   the people them going to check, right.  When the drug van

17   come to the yard, they don't check everybody.  They come with

18   a list.  If your name is on the list, you get tested, right.

19       Q.    But is this the test to get hired to be a road

20   worker or is this a test that happens during your working?

21       A.    During your working time.

22       Q.    Now, during the test to become a road worker to be

23   hired before you start working, is that random?

24       A.    No, that test is a must.

25       Q.    That test is the same every year?

C. Gibbon

1      A.    Every year.

2      Q.    Now, for the test in 2006, when was that test that

3   you had a problem?

4      A.    2005.

5      Q.    Did you tell them you had a problem when you first

6   got there?

7      A.    No, when I went it was the girl that control the

8   test, it was Ray Sommers (phonetic), right.  They say I must

9   go down to Ray, that was a sort of random testing.  They just

10  call and say Clifton, go down and take the drug test, right.

11     Q.    But this test, was it a pre-hire test or post-hire

12  test?

13           The test where you had the problem, that was

14  pre-hire or post-hire?

15     A.    No, if I did take that test and I didn't have -- if

16  I did give them the urine and them check the urine and find

17  the urine negative, I would go straight back to work.

18                 MR. FRIEDMAN:  Let's take five minutes.

19                 (Whereupon, a short recess was taken.)

20                 (Time noted:  11:11 a.m.)

21                 MR. FRIEDMAN:  Back on the record.

22                 (Time noted:  11:12 a.m.)

23  BY MR. FRIEDMAN:

24     Q.    Now, we were talking about a drug test from

25  February of 2005, that's the test where you had a problem?

C. Gibbon

1       A.    I don't see what you're talking about, man.

2    BY MR. FRIEDMAN:

3       Q.    Paragraph ten, then it refers to due to

4    Mr. Gibbon's inability to provide urine specimen --

5       A.    Yes, I see it now.

6       Q.    -- on February 17, 2006.

7       A.    Yes.

8       Q.    So you see that?

9       A.    Yes.

10       Q.    Now, do you recall February 17, 2006, that day?

11       A.    To tell the truth I take so much drug tests, you

12    know.  To pinpoint it out, it's only one test I really

13    remember in my mind is when I went to take the test when my

14    prostate was swelling, that's the only one definitely I

15    remember to tell you the truth.  You see, I take so much.

16       Q.    Was that this test in February?  When your prostate

17    was giving you --

18             When you say your prostate was giving you a

19    problem, was that during this test on February 17, 2006?

20       A.    Yes, must be because I stop work 2006, it must be.

21       Q.    So if you were taking a drug test in February, that

22    would be a drug test before you start working?

23       A.    Yes, before.

24       Q.    So it wasn't a random drug test?

25       A.    No, it's the start of the season, so you've got to

C. Gibbon

1    take that test to go back on the job, yes.

2         Q.    So when you showed up on February 17th, did you

3    know that your prostate was giving you problems?

4         A.    Yes, I know because in 2005, December, that's where

5    I really find out that -- I didn't even know that it was my

6    prostate.  I went to take that test before and I say I

7    couldn't urinate.  So after I leave over there and go back to

8    the yard, I say to myself, I said something is wrong with me.

9              So I'm affiliated with HIP.  My family doctor in

10   HIP.  So I call HIP and I make an appointment with my

11   doctor which is Dr. Bharara.  And so she give me the

12   appointment date.

13             So I leave the evening and I go to Dr. Bharara.  I

14   say, doc, man, I've been through something very much

15   embarrassing with me, man.  I said I have to take a drug test

16   and when I go over to the bowl to urinate, no urine can't

17   come out, me say me bowel is full with the urine.

18        Q.    I'm sorry, what date was this when you -- what day

19   was this when you realized that you had this problem?

20        A.    It was the last time they called me in December,

21   2005, because the season was coming to a close, right.

22             And then, now, I went to the doctor that time and

23   when the doctor check me, the doctor told me that my prostate

24   glands did start to swell, that's why the urine cannot come

25   out.

C. Gibbon

1    Q.    Was that a random test in December?

2    A.    Yes, that was a random test because they just

3    called me from the field.

4    Q.    Now what happened, were you able to give them any

5    urine at all?

6    A.    Yes, I give them urine because the time, I was the

7    second one in the office that day, and I was the last person

8    leave because the person who conduct the test name was Ray

9    Sommers, Ray stay at the office with me until I give -- I go

10   over the bowl and the urine just take time, start to trickle,

11   take time coming out, coming out, until it eventually just

12   build up and start to come out force.  And I filled up the

13   container and leave it with Ray.

14        So that was the time now, I say, I never have -- I

15   never used to have those problems before, so I say there must

16   be a problem, so I said there must be something wrong with

17   me.

18   Q.    That was in December of 2005?

19   A.    Yes, December of 2005.

20        So now I went to the doctor, the doctor check me

21   and the doctor say, Clifton, your prostate gland started

22   swelling.  I said doc, is it serious that I may have to get

23   an operation?  The doctor said, no, you don't need an

24   operation, there is medication that can fix that.  I feel so

25   glad and joyful because me fraid of the knife.

C. Gibbon

1    Q.    This was Dr. Bharara?

2    A.    My family doctor.

3    Q.    You went there in December?

4    A.    December 5th.  I got to see that doctor practically

5    every month, me have to test me pressure, to get me

6    prescription to pick up me medication.  She know me very

7    well.  So now she write a prescription and give me now, so I

8    go to the pharmacy and I pick up these tablets they call

9    Flomax, to carry back down the prostate to a normal size,

10   right.  Well, I've been taking those tablets, when I just get

11   the tablet and take the tablets, I don't have no problem

12   urinating.  I urinate normal.  I feel like urinate, me just

13   go to the bathroom, boom, me no stand up in here no long

14   time.

15          But the time now when I go now to take this test

16   now in 2006, the tablet finish, right.  So now me call doctor

17   -- at first Dr. Bharara tell me say Clifton when the tablets

18   is finish and if you still have the problem, I must come back

19   to her and she will send me to a specialist and that

20   specialist will get rid of that problem once and for all.

21   Q.    Do you remember when they finished?

22          Do you remember when you ran out of the pills?

23   A.    It was about two days, two or three days before me

24   go down in 2006 to get this drug test, so me call.

25   Q.    So that would be about February 14th or 15th?

C. Gibbon

1          A.    I tell you it's quite a while and I want to tell

2    you the truth, the definite truth, everything I'm telling

3    you, right.  It's about two or three days before I go down to

4    take the test to go back to work, right.  I realized that the

5    tablets is out.

6          So now how me get my prescription?  All the while I

7    call the doctor.  I never get the doctor at that time, me get

8    the doctor receptionist, right.  So I tell the receptionist,

9    say, you must do me a favor, tell Dr. Bharara that me

10   tablets, me Flomax tablets is finish and I'm going again for

11   a drug test and I don't want me have a problem urinating or

12   anything like that, so please tell Dr. Bharara.  The guy in

13   front say all right, him tell Dr. Bharara, right, but

14   Dr. Bharara never call me back.

15         Q.    So during those two to three days, you know, you

16   ran out of the pills; but before your drug test, were you

17   having problems urinating at home?

18         A.    No.  When I'm talking the pill, everything was all

19   right.

20         Q.    After you stopped taking the pills -- you said you

21   ran out of the pills two or three days before the drug test?

22         A.    Yes, I notice, you see when I go into the bathroom

23   when I didn't have the pill, I go into the bathroom and just

24   ready, I gone, but when I run out of the pill --

25         Q.    What do you mean, describe it?

C. Gibbon

1          A.    You is a man, right?  You is a male, right?  You go

2      into the bathroom, you pull down your zip, you take out your

3      private, you put it over the bowl, you come, you pee, right

4      out.  But when the tablets run out, that's why I call her,

5      when me go in and go now to the bowl to pee, me have to stand

6      up maybe four, five minutes before the urine come out, you

7      know.

8              And the longer I don't take the tablets, the longer

9      the urine take to come out, you know.  So that's the reason

10     why me call Dr. Bharara now to give me the prescription to

11     get the tablets because what I was planning to do, you know,

12     after I get that set of tablets, right, and I go back to

13     work, I was going to go back to Dr. Bharara and tell her say,

14     doc, it seem like the prostate problem is still there.  So as

15     you say, you're going to refer me to a specialist, more than

16     likely send me to the specialist now for me to get rid of

17     that problem once and for all.

18         Q.    How many times did you call Dr. Bharara to get the

19     medicine, do you remember?

20         A.    Me call her one time, man, one time because it's

21     the first the medication run out.  Me call her one time but

22     she never respond to the call, right.  She never -- me never

23     hear back from her until when the City send me to Westbury to

24     them doctor to check me.  What really wrong with me.  When I

25     was on my way back over now, my phone ring, when I pick it up

C. Gibbon

1    it was Dr. Bharara.  So me say, doc, me tablets run out and
2    me tell -- I think the receptionist, I think the guy's name
3    Marcus or something like that.
4        Q.    Before we get that far, on February 17th when you
5    went for the test, do you remember what time the test was,
6    during the day, was it the early in the morning, was it in
7    the afternoon?
8        A.    I think it was from 12; from about 11 to 1.  I
9    think it was about that, from 11 to 1 at 40 Worth Street.
10       Q.    Before you got to the test, were you at home?
11       A.    Yes, I leave my home and go straight.
12       Q.    Were you able to urinate before you got to the
13   test?
14       A.    Well, tell you, the morning when me wake up, right,
15   and me see I was having problem, you know, to start to
16   urinate.  You know, when you wake up in the morning you go to
17   the bathroom, you make a leak before the day, right.  That
18   morning I get up, man, I never -- me feel like me want to
19   urinate but me go to the bowl but me never really urinate, me
20   sore of hold it in.  That mean when I go down 40 Worth Street
21   to take the test, true me have the whole heap of urine in me
22   and me go, the urine just come out and me just give them the
23   urine and that would be it because me never worry about the
24   drug test because I don't deal with drugs, you understand.
25           So only thing they can find in that urine is the

C. Gibbon

1    pressure tablets or something like that, that's all them can

2    find in the urine, so I never worry about it, so the morning

3    me never urinate at home.

4        Q.    You did or you did not?

5        A.    No, me never urinate at home, me keep it in me.

6        Q.    So when you got to the test, did you tell the

7    person running the test that you were having problems?

8        A.    Yes, Ray Sommers, when I went in the first time --

9        Q.    What do you mean the first time?

10       A.    I went in about four times down at 40 Worth Street.

11   The first time when I went in --

12       Q.    On that same day?

13       A.    On that same day.  The first time when I went in

14   and I tried to, you know, to let the urine come out, you

15   know, you alone, don't go in the men's room, a man walk with

16   you, go in there, right.  And them time you, them must be

17   give you two or three minutes, I don't remember the direct

18   time, and the guy tell me say your time up.  Man, we would go

19   out, back, try again.  So when we come out of the bathroom

20   now, Ray Sommers --

21       Q.    So the first time you went in, you weren't able to

22   go?

23       A.    No, but at the same time my bowel full with the

24   urine, you know, it come like down there going tear out, you

25   know, so me come out back, me say, Ray was at her desk

C. Gibbon

1    because she supervisor the drug test.  Ray is a girl like

2    this, me talk to Ray good, we know each other on the job.  Me

3    say Ray, it seem like me have the same problem, you know,

4    like the last drug test what I take with you because the same

5    way me go in there now, Ray, me bowel full with the urine and

6    the urine nah come out.  Ray say, all right, go try again,

7    and that day I make about four try.  They have some little

8    bottle of water about this high, you know, this long, you

9    know.

10        Q.    You came out with water, this much water?

11        A.    No, the City, at the city them have water.

12        Q.    They gave you water?

13        A.    Yes, they gave you water there, you know, a bottle

14    about this high, long (indicating).

15              MR. CARBERRY:  That about half a litter?

16    BY MR. FRIEDMAN:

17        A.    About that, you know.

18        Q.    How much would you say, is that a cup, more than a

19    cup, two cups?

20        A.    If it's not a cup, it's little bit more than a cup.

21    So me drink -- when I go in the first time and the urine

22    don't come out.  Me drink it, me drink because, you know,

23    that will sort of bill up the urine enough to come out.

24              Go back the second time, the urine nah come.  Me

25    drink it again, the urine nah come.

C. Gibbon

1          Go back the fourth time, the last time now me drink

2    it and me stand up in the place, just build, want the urine

3    to come out.

4        Q.    How long were you there?

5              How long were you waiting --

6              So after you tried the first time?

7        A.    Yes.

8        Q.    Nothing happen?

9        A.    Nothing happened.

10       Q.    They said here is some water, wait?

11       A.    Yes.

12       Q.    How long did they give you to wait?

13       A.    It depends on me, right.  It depends on me.  Say,

14   whenever me feel like I want to go, they say all right,

15   whenever you want to go, go back in the men's room.  So my

16   bowel is full with urine, right, and me feel like me want to

17   go again.  So me go.  Me say, look, let's go and try it

18   again, right.  We go back in the men's room.  The guy come

19   with me, check, him watch.  Him say well, all right, Clifton,

20   your time up again.

21             We go and go until the fourth time now, we drink

22   another bottle of the water, me go in and me wait, wait,

23   wait.  Even the guy who come with me, he even give me extra

24   time, you know, say it's a three-minute thing, he would give

25   me four.  And him say, you know, come.  Me say to Ray, the

C. Gibbon

1    same problem me have like the last time me come, you know.

2    Me say Ray, me check me doctor and me doctor say my prostate

3    problem, it started swelling.  When it swell, it block the

4    passage for the urine to come out and that is it, right.  Ray

5    say, I don't know what to tell you.  You know what, Clifton,

6    I'm going to send you to our -- the DOT doctor.  I say Ray, I

7    would do anything because I know it's my prostate because my

8    doctor, Dr. Bharara, tell me that before, right, so.

9         Q.    When did this person tell you this?

10        A.    Who?

11        Q.    Who told you to go to the DOT doctor, that you had

12   to go to the DOT doctor?

13        A.    It's Ray -- no, Ray say come, Clifton, I'm going to

14   take you to somebody else.  She take me to this other woman,

15   Anna Budd (phonetic).

16        Q.    I'm just trying to understand what the time frame

17   was, was this how many hours after you first got there to 40

18   Worth Street?

19        A.    I see Anna Budd?

20        Q.    Yes.

21        A.    It's after they say the time frame for the test was

22   from 11 until 1.  After I wait out that time, and my time has

23   passed now, Ray take me and Ray say, all right, come, I want

24   you to go see somebody.

25             So when I look, Anna Budd -- come Anna Budd start

C. Gibbon

1    to scope the federal law, tell me say, it's federal law,

2    you've got to take the drug test and this and that. Me say

3    to her, Ms. Budd, look, me say, I'm a law-abiding citizen,

4    man. Me say I'm a middle-age man and a policeman never put

5    handcuff on me, I never commit myself or anything. I say I

6    know that the drug test is a must, you've got to take the

7    test to go back to work, but I say I have a medical problem,

8    I say I have a prostate problem. Me say my doctor at HIP

9    told me that my prostate gland started swelling and I have

10   problem urinating, right. So it's not definitely my fault,

11   me say if I could fix the prostate, I would fix it and give

12   the urine right away.

13          So them say well, all right, you drive? I said

14   yes, I have a car. Him say well, I'm going to send you to my

15   doctor, my DOT doctor. I say where? Him say Westbury -- no,

16   Westchester. Me say Westchester? Me say I don't know

17   Westchester, you know.

18       Q.   Before you get to that, so you were at 40 Worth

19   Street for a number of hours?

20       A.   Yes.

21       Q.   Were you able to urinate at all?

22       A.   No, I don't urinate in 40 Worth Street at all. You

23   know when I urinate, I actually wet up myself, you know, at

24   Flushing station. After they send me from 40 Worth Street

25   and say I must go to Westchester, me park my car in a parking

C. Gibbon

1    lot, a Chineman parking lot in Flushing, right off 41st

2    Avenue near the subway station, right.  So me have to come

3    back now to get me car to drive to Westchester.

4         When I was leaving out of the DOT building now, Ray

5    Summer's was coming out, me say Ray, me feel like the urine

6    going to come out now give me another try, man, make me go

7    give you the urine.  Ray say no, no, your time pass.  Go on

8    and check the DOT doctor and let we know what's really wrong

9    with you.  So me say Ray, me no tell you say me prostate

10   gland already swelling, that's why he can't get the urine.

11   Him say go on, go on.  And me say all right.

12        On my job, any supervisor talk to me or give me an

13   order, I always go through with it, me is a very peaceful

14   guy, me don't give any problem or anything, so me leave

15   now --

16        Q.    Mr. Gibbon, again, I just went to understand your

17   day.  So you showed up at 40 Worth Street, you stated about

18   11:00 in the morning?

19        A.    Yes.

20        Q.    And what time did this person tell you to go to

21   Westchester, do you remember?

22        A.    Well, it must be about 1:15 or 1:30 because I think

23   the drug test was for three hours from 11 until 1 and after

24   my session of the drug test was over, Ray went and call her,

25   and Anna Budd say and Ray Summer's -- when Anna Budd say I

48

C. Gibbon

1     must go to Westchester to the medical people.

2            Q.     Did you go, were you supposed to go to Westchester

3     that same day?

4            A.     Yes.

5            Q.     Did you?

6            A.     But I never find the spot.  I tell them say I don't

7     know Westchester, right.  Anna Budd say them would write down

8     the direction on a slip as plain as ever to give me.  I take

9     the direction.  I put it -- I drop the direction on the

10    passenger's side of the car and by driving me glance at it,

11    you know, and driving and I miss one turn.  I messed up.  I

12    can't forget man, me end up on Westchester Avenue what take

13    you straight under the train line, right.  Now, the road was

14    so narrow and you have the wall on one side and how they call

15    it, like the Jersey borough is on one side.

16           Q.     So did you turn around and go back to the place?

17                  Did you find the doctor's office that day?

18           A.     No, when I really get to find out where the doctor

19    is and I call the doctor office to let him know that I'm

20    still in Westchester, I will be there, right.  When I call

21    the nurse tell me that, no, the doctor leave about 15 minutes

22    ago.

23           Q.     What time was this?

24           A.     That was about 10 past 5 or something like that,

25    I'm not sure.

C. Gibbon

1      Q.    What did the nurse tell you to do?

2      A.    The doctor gone for the day so the doctor wasn't

3   going to come back.  So in my thinking now, I just say I got

4   to get back home now.  So I leave Westchester heading back

5   for home.  Now, they give me the direction to go, you know,

6   but they never give me the direction to come back.  So on the

7   way now, go that way, I crossover and go on the other side to

8   get back in, right.  But that was a very stupid thing because

9   I leave out of the Westchester in the evening about, say,

10  5:30, you know what time I reach home, I never reach home

11  until 1:15 the same day.

12     Q.    Did you go back to the doctor in Westchester?

13     A.    Yes, the following -- well, about 6:30 in the

14  morning now my phone ring, when I picked up --

15          Before that, the follow day now when I miss the

16  road, right, and I couldn't find the place, I call -- I take

17  up the phone and I call Ray Summer's.  I called Ray.  Her

18  phone just keep on ringing, ringing, ringing; nobody picked

19  it up.

20          When I turn back now and coming back in, I still

21  have the phone on my ears.  You know, if a cop see you with a

22  phone on your ears, it's a charge.  Me going this way, a cop

23  car was coming up here and I know the policeman see me with

24  the phone on me ears because he look.  And me take the phone

25  and me throw it in the glove compartment and step on the gas

C. Gibbon

1    and just get out of the area.

2         Q.    Mr. Gibbon, when did you get to the doctor, though?

3         A.    The following day.

4         Q.    At what time?

5         A.    About 10, 10:30.

6         Q.    What happened at the doctor's office?

7         A.    Well, I went in --

8         Q.    Had you been able to urinate between the night

9    before and the doctor's office?

10        A.    No.  No.

11        Q.    So this was 24 hours of non-urination?

12        A.    No.  True, I'm going back now, right, and I think

13   that I'm going to do the drug test over there, I doesn't

14   urinate at all.  I try hold it in.  Right.  When I go over

15   there and I did have problem for them to admit me because

16   they told me at 40 Worth Street that they set an appointment

17   with the doctor, for certain time I must be there, right,

18   because Ray Summer's tell me say, Clifton, if you doesn't

19   keep this appointment, you lose your job.

20        Q.    This was the day before, though?

21        A.    The day -- which day you're talking?

22        Q.    February 17, 2006, the day you had the drug test at

23   40 Worth Street, they told you to go to the doctor that

24   afternoon, they made an appointment?

25        A.    Yes.

C. Gibbon

1        A.    Give me a form to fill out the form and me fill out

2   the form and she said the doctor will see you and me hand her

3   back the form and I wait about another hour-and-a-half and

4   then this doctor come.

5        Q.    Do you remember the doctor's name?

6        A.    Michelle Bonamassa.

7        Q.    Do you remember about what time this was when you

8   saw the doctor?

9        A.    No, tell you the truth, I don't really recall the

10   time because --

11        Q.    Was it about noon?

12        A.    Call it, say it's about -- about 12 or to 1:30,

13   within the time period.  I don't remember the specific time.

14        Q.    Then when you went in to see the doctor, what did

15   the doctor do to you?

16        A.    Well, I was in the room and the doctor come in and

17   the doctor say what's wrong?  I say well, doc, I'm working

18   for DOT and I went to do a drug test and to give them the

19   urine for them to test me with.  Doc, my bowels is full with

20   the urine but the urine just wouldn't come out.  She said all

21   right Clifton, take off your clothes, undress and go on the

22   table.

23        Well, the same test what that doctor give me is the

24   same test my doctor give me, right, so after she test me and

25   she said all right --

C. Gibbon

1    Q.    What kind of test is that, it's a prostate test?

2    A.    Yes, a prostate test.

3    Q.    Did they take blood?

4    A.    Yes, they take blood and I give them urine that

5    same day, too.  The urine didn't take long, I had to wait

6    about two hours in the men's room to give them the urine, but

7    still I give them blood and I give them urine over there,

8    right.

9         And I said, Doc, what you see wrong with me?  The

10   doctor say, Clifton, your prostate is swelling.  I said, Doc,

11   it's serious to where I have to take an operation?  The doc

12   say, No.  He say, They have medication you can take to bring

13   the prostate to normal.  So I said, Well, Doc, that's what my

14   doctor at HIP had tell me.  I'm affiliated with HIP, my

15   doctor name Dr. Bharara, tell me that them have medication to

16   bring it down and me say, Doc, she give me Flomax tablets.

17   Doc say, yes, that's the tablets, just keep on taking that

18   tablets and everything will be all right.

19        And him say anyway, I want some blood from you and

20   I want some urine.  I say, Doc, the urine, you can get the

21   urine, you know.  But the blood -- me say the blood, you can

22   get the blood, you know, you can draw the blood, but the

23   urine, that's why you have me here.  I said I don't sure if

24   the urine will come out.  The doctor say, All right, Clifton,

25   go and try.  I said, Okay, Doc.  Me put on back on me clothes

C. Gibbon

1    and she draw the blood and me go in the bathroom.

2            Man, it's not a pretty nice thing, you know, your

3    bowel full with the urine, you really want to go but the

4    urine just wouldn't come out and me stand up in the bathroom

5    for about maybe hour-and-a-half, you know, at the bowl.

6        Q.    At the doctor's office, you were in the bathroom

7    for about an-hour-and-a-half?

8        A.    Yes, me stand up there long time.  Me never time me

9    self but me just estimate it for about that and me stand up

10   at the bowl, man, with me dick out over the bowl with the cup

11   and the urine couldn't come out.  It's sort of embarrassing,

12   you know, and the urine couldn't come out.

13       Q.    So it was the -- like the same thing that happen

14   the day before?

15       A.    Yes, at 40 Worth.  So now me zip up back me self

16   now but me sort of leave me self free, you know, and relax

17   and as me going towards the door now, me feel like a little

18   something did come out, so me sort of ease up, soon me feel

19   me start to wet up me brief.  So me just turn back now zip

20   back down me thing and take it out, it start to tip, just

21   tip, tip until it start to come out force.  Me just stretch

22   out me hand and take up the cup off of the face basin and

23   fill up the cup.

24           If you see the amount what come out, man, it would

25   have filled the cup about six times, because the cup is about

C. Gibbon

1    that tall and me just empty the rest in the bowl and me carry

2    the urine and give the nurse it and the same time me give the

3    nurse it, me did want that doctor to call my doctor, Dr.

4    Bharara and them converse because them medical people.  Me

5    give that doctor Dr. Bharara name and phone number when she

6    was with me and me give the nurse again, me write down

7    Dr. Bharara phone number and give the nurse and me say

8    remember, give the doctor that.

9         Me ask the nurse, are you finish with me now?  The

10   nurse say yes.  So me leave and me come out.

11   Q.    Did you ever find out the results of what they

12   found?

13   A.    That doctor say -- me never see the result, it's

14   Leonard Poletto (phonetic), the other lawyer, he got --

15   Q.    Who?

16             MR. LICHTEN:  Leonard Poletto, that is the

17             union lawyer.

18   A.    Him get the report from Michelle Bonamassa but that

19   report it coincide with my doctor report at HIP, said that

20   the prostate gland was swelling a lot, that's why the urine

21   couldn't come out.

22        The only difference with my doctor report with

23   Michelle report, my doctor put in it say Clifton will have

24   problem in urinating.  That doctor in that report, the doctor

25   never say me will have problem urinating, but my doctor put

C. Gibbon

```
 1    in it in say I will have problem in urinating and I'm on

 2    Flomax tablets.

 3    BY MR. FRIEDMAN:

 4        Q.    Did you go back on to Flomax, did you refill your

 5    prescription?

 6        A.    Yes, I refill me prescription because it's very

 7    embarrassing, man.

 8        Q.    Do you remember when you refilled it?

 9        A.    On the 18th when I come over, my doctor say,

10    Clifton, come to the front desk.  I will leave a prescription

11    for you.  Well, from that time, me went and pick up --

12        Q.    You said 18th, you mean 18th of February?

13        A.    Yes, February.

14        Q.    2006?

15        A.    2006.

16              From that time me went and me pick up prescription

17    on the 18th when I come over, right.  And me pharmacy is just

18    on Hillside, 169th.  Me just come down there, fill the

19    prescription and me just start to take the tablets.

20        Q.    Are you on Flomax now?

21        A.    No, that is from 2006 and now it's 2008, man.

22        Q.    Did you have a surgery or --

23        A.    No, I don't have no surgery.

24        Q.    So what happened to your prostate?

25        A.    Well, I don't know.  Well, now maybe it isn't
```

C. Gibbon

1   working that properly or good still because I don't check

2   back me doctor because when I leave -- when they stop me from

3   work they cut me medical, right.  They cut everything because

4   for me to go and pick up -- to see the doctor now, I have to

5   pay $94 just to see the doctor, right.  And me have to pay

6   again to get me pressure pill, right.  So I never go back and

7   see the doctor for him to check me for anything with the --

8   about me prostate.

9        Q.    When was the last time that you ran out of Flomax

10  pills; do you understand?

11       A.    It's in 2006, man, because from this case been

12  going on, right, me get three refill on the Flomax tablets,

13  right.  And that time I wasn't in DOT.  The reason why I

14  continue taking the Flomax at that time now, I was expecting

15  that they would call me back, because I say I don't see how

16  them can fire a person who really have a medical problem,

17  right.  It's not really my fault I have something like that,

18  it's just the organ -- me prostate swelling.

19       Q.    So you got a new Flomax prescription?

20       A.    Yes.

21       Q.    On February 18, 2006?

22       A.    Yes.

23       Q.    How long did those pills last until?

24       A.    Well, really and truly me never really check the

25  day, you know.

C. Gibbon

1     Q.    About?

2     A.    About, whenever I have a full one hold about 28 or

3    29 or 30 tablets.  I take one tablet a day.

4     Q.    You said you had three refills?

5     A.    I had three refills.

6     Q.    So you were on Flomax for about three months?

7     A.    After that, yes.  I'm not sure, but you can

8    estimate it about that.

9     Q.    Now, after you were done with the Flomax --

10        So that would be, one month would be to about March

11   18th, two months would be about April 18th and three months

12   would be about May 18th of 2006?

13    A.    Yes.

14    Q.    Did you get another prescription after that?

15    A.    No, I never go back to her because --

16    Q.    Because you were out of work?

17    A.    Yes.  I was definitely out of work and out of money

18   because they wouldn't see me because I have to pay for it.

19    Q.    Now, after you ran out of the Flomax, did your

20   problems urinating come back?

21    A.    Well, it come and goes, you know, because true,

22   now, you know, me don't have any demands to time me self to

23   two- or three-hour time me have to urinate, right.  Me would

24   go to the bathroom, man, and me just go to urinate and if it

25   don't come, me just stand up and wait until it come.

C. Gibbon

1    Q.    How long would you have to stand up and wait?

2    A.    Sometime me go in there it just come, another time

3    it take about two minutes.  Another time it takes about four

4    minutes but, you know, it never really affect me that way

5    because, you know, me know definitely doing it for a test or

6    anything like that, me just go in and just urinate just like

7    that.

8    Q.    How would it affect your everyday life, were you

9    able to, you know, do everything you normally do?

10   A.    Yes, it doesn't bother me, right.  Because when I'm

11   on the job, right, out in the field cutting and me feel like

12   me want urinate, you know, you have to find a little place

13   where nobody can see you, me go and take out me, you know, to

14   urinate.  It no come.  Me just fix up back me self and me

15   just start work again.  Me feel like me want go again, me go

16   hide again and it no come, me just put up back me -- and me

17   just go work again until eventually me go to go do it, it

18   just come.  But when it come, it does come out, plenty just

19   come out one time.  Fix up back me self and me gone.  It

20   never affect me no time on me work, you know.

21             MR. FRIEDMAN:  Off the record.

22             (Whereupon, an off-the-record discussion was

23        held.)

24             (Time noted:  11:57 a.m.)

25             MR. FRIEDMAN:  Back on the record.

C. Gibbon

1                    (Time noted:  12:09 p.m.)

2        BY MR. FRIEDMAN:

3            Q.    Mr. Gibbon, before we go on with additional

4        questions, I just want to do a recap, we were kind of, you

5        know, we kind of got all over the place, I just want to have

6        a good timeline about February 17, 2006.

7            A.    All right, go ahead.

8            Q.    So you were notified to come in for a

9        pre-employment drug test?

10           A.    Yes, first of the year; yes.

11           Q.    You came in for the drug test at 40 Worth Street?

12           A.    Right.

13           Q.    At what time?

14           A.    From 11 'til 1.  I think it's about a three-hour

15       test, from 11 until 1.

16           Q.    Then you testified that during that time period,

17       you were not able to urinate?

18           A.    Right.

19           Q.    They gave you -- you testified that you were given

20       water to drink?

21           A.    I think, yes.  I think it was four bottles of

22       water.

23           Q.    You also testified that they gave you -- that you

24       were able to try and urinate whenever you felt the need to?

25           A.    Right.

C. Gibbon

1      Q.    Then you testified that after a number of hours,

2   they referred you to a medical center in Westchester?

3      A.    Right.

4      Q.    Was it two hours or three hours?

5            Were you at 40 Worth Street trying to urinate for

6   two hours or was it for three hours; do you recall?

7      A.    It depends on the time the drug test, for instance,

8   if the drug test is from 11:00 until 1, that was the time

9   span that I was on to give them the urine.

10     Q.    Was that the time span?

11     A.    Yes, I think it was the time span, right, maybe

12   from 11 until 1:00, I couldn't really pass the urine because

13   the prostate was swelling, right.

14     Q.    So at 1:00, you testified that you had not been

15   able to produce enough urine?

16     A.    And I don't produce no urine whatsoever; none no

17   come.

18     Q.    Then you testified that they said now you have to

19   go see the DOT doctor?

20     A.    Right.

21     Q.    And you testified they gave you directions to

22   Westchester to go that day?

23     A.    Right.

24     Q.    Then you testified that you drove to Westchester in

25   your own car?

C. Gibbon

1    I said, well, Doc, I called you yesterday about the tablets

2    because my tablets run out and I come now to take this drug

3    test and me say, Doc, the urine don't come out and she say,

4    All right, Clifton, come to the center.  I will leave a

5    prescription at the front desk for you.  So I went the same

6    day on the 18th when I reach back New York and I went and I

7    pick up the tablets.

8        Q.    And that was for --

9              That was a prescription that had about 29 to 30

10   tablets in it and it was refillable three times?

11       A.    Yes.

12       Q.    And you eventually ran out of Flomax approximately

13   May of 2006?

14       A.    Yes, about that time, about three months.

15       Q.    You have not taken Flomax since that time?

16       A.    No, because -- maybe.  I don't sure.  Maybe the

17   prostate problem is fix now.  I don't know, because I never

18   go back to the doctor for the doctor to check me if the

19   prostate is still swelling but sometime I want to go, at

20   times not all the while, at times, you know, I take a little

21   time more.

22       Q.    So the prostate problem is still there?

23       A.    I don't sure.  Maybe.  I don't know for sure.  A

24   doctor have to test me.

25             You understand?

C. Gibbon

1    Q.    Okay.  I understand.

2         Now, I just want to know when you went for the test

3    on February 17th, when you first went into 40 Worth Street,

4    did you request anything?  Did you tell them, look, I have a

5    prostate problem?  Did you say anything to them?

6    A.    No, I never say anything to nobody at first until

7    when I went in to give the urine because I was sort of

8    certain that the urine could come out because I never had

9    that problem before and when the urine doesn't come out, when

10   they guy say your time is up.  I went back and Ray was

11   sitting around the table just like you, and I went to her and

12   I say, Ray, it looks like I still have the problem, you know,

13   because the last time the problem I had with you, I was the

14   second person in the office and I was the last person leave.

15   I said, I seem like I have the same problem.  And Ray say,

16   All right, try again Clifton and that was it.

17   Q.    Now, did you tell --

18        Did you ever make a phone call or write a letter or

19   tell anybody at DOT that you had this problem?

20   A.    No.  You see because it was actually the end of the

21   year, you know, when they send me on this test, right.  I

22   never tell anybody.  I just went to me doctor.  Me doctor

23   tell me and I keep it to me self, because normally I don't

24   even really know why I never tell anybody, mention it because

25   maybe if I did tell one of my supervisor in the yard or

C. Gibbon

1    somebody, them would definitely advise me and tell me what to

2    really do to prevent this problem that I'm in.  So I sort of

3    keep it to me self, you know.

4         Q.    When you went on February 17th for the drug test,

5    did you ask them for more time to urinate, did you ask them

6    for any sort of accommodation?

7         A.    Well, in the last -- after the test over, right, me

8    feel like I was going to come, me said to Ray, me say, Ray, I

9    want to try again because me feel I would come now.  Ray say,

10   You know what, go on, go on to the doctor and find out what

11   happened to you.

12        I always obey me supervisor or anybody who talk to

13   me.  So me say, All right.  Me just leave and me go to

14   Westchester.

15        Q.    That was at the end of your time there, that was

16   after two or three hours?

17        A.    Yes.  Yes.  After that.

18        Q.    I just want to ask you about damages now.  So I'm

19   going to ask you, you know, if you can tell me what sort of

20   damages you've suffered, loss of income, permanent damage to

21   your reputation.

22        I got a little ahead myself, to start off your

23   Complaint is that you're complaining that you're

24   discriminated against because of a disability?

25        A.    Right.

C. Gibbon

1    Q.    And your disability is what?

2    A.    Swelling of the prostate.  Slight swelling of the

3    prostate.  The prostate is not bad, you know.

4    Q.    So this slight swelling of your prostate, aside

5    from what you've already told us about the difficulty in

6    urination, is there anything else that it causes?  Any other

7    problems that it causes you aside from what you've already

8    told us?

9    A.    No, it just give me problems to pee sometimes,

10   that's it, nothing more.

11   Q.    Now, what happened or what leads you to believe

12   that you were discriminated against because of your

13   disability?

14   A.    Well, I was supposed to go back to work, right.

15   When I went -- I went to their doctor and my doctor then

16   confirmed it, right.

17          They say I refused from take the drug test, right.

18   I never refuse it, right.  I tried to give them the urine but

19   the urine just wouldn't come out, right.  So they say

20   Clifton, they say refusal from take the drug test, it come

21   back as a positive answer towards the drug test, right.  So I

22   don't see how I can be charge for positive drug test wherein

23   I doesn't use drugs.  They doesn't find any drugs in my

24   system, right, or anything like that.  So how can I be fired

25   for that?  And I really doesn't do it.

EXHIBIT B

## ASSIGNMENT & TRANSFER FORM

☒ **NEW APPOINTMENT**          ☐ **PROMOTION**          ☐ **REASSIGNMENT**          ☐ **TRANSFER**

EMPLOYEE   **GIBBON**                    **CLIFTON**               G.
            Last Name                     First Name              Middle Initial

---

(Appointments, Promotions & Reassignments Only)

Home Address                    **Flushing, N.Y.**        **11355**
               Street                     Borough/Town           Zip Code

Home Telephone #                  Position #              $ **15.12 p/hr**
                                                              Rate

---

## NEW ASSIGNMENT

Title **Assistant City Highway Repairer**           Effective Date **04/09/01**

Responsibility Center **Street & Arterial Maintenance**   Section _____

Immediate Supervisor **Bencivengo**                **( 718)591·7055**

Work Location **78-88 Park Drive East, Kew Gardens**
              Full Address

| **HE02** | | **2165** | **2160** |
|---|---|---|---|
| Payroll Distribution | Soc. Sec. # | Work Unit/Location | Budget Code/Budget Line |

Responsibility Center Manager _____     Deputy Commissioner _____

---

## FORMER ASSIGNMENT (TRANSFERS ONLY)

Responsibility Center _____          Budget Code _____

Immediate Supervisor _____

Work Location: _____
                        Full Address

Reason for Transfer _____

Responsibility Center Manager _____     Deputy Commissioner _____

---

1. New Supervisor
2. Employee
3. Personnel Files
4. Former Supervisor

*Jean Frankowski (hh)*
Director of Personnel

rev 11/96

1. NEW SUPERVISOR                    **PER0088**

EXHIBIT C

```
SOC SEC NO: 101 68 4885       EMP NAME:    GIBBON         CLIFTON       G
PAY NO:     841               JOB SEQ#:    1              CURR LV STAT: A
EFF DATE:   01/02/07
```

| CHG NO | EFF DATE | RSN TYPE B T M L X | RSN CD | ----------DESCRIPTION---------- | LV STAT |
|--------|----------|----------------------|--------|---------------------------------|---------|
| 01 | 12/10/05 |              –       | O08 | TERMINATE NON-PERMANENT   | A |
| 02 | 03/13/05 | – – – –             | A92 | LABOR CLASS APPOINTMENT    | B |
| 03 | 12/12/04 |              –       | O08 | TERMINATE NON-PERMANENT   | A |
| 04 | 06/23/04 |              –       | A96 | ERROR CORRECTION           | B |
| 05 | 05/03/04 | –                   | G02 | WORK UNIT CHANGE           | B |
| 06 | 03/14/04 | – – – –             | A92 | LABOR CLASS APPOINTMENT    | B |
| 07 | 12/14/03 |              –       | O08 | TERMINATE NON-PERMANENT   | A |
| 08 | 07/23/03 | –                   | X98 | BUDGET CHANGE W/IN AGENCY  | B |
| 09 | 03/16/03 | – – – –             | A92 | LABOR CLASS APPOINTMENT    | B |
| 10 | 02/05/03 |   –                 | A96 | ERROR CORRECTION           | A |
| 11 | 12/14/02 |              –       | O08 | TERMINATE NON-PERMANENT   | A |
| 12 | 06/01/02 | –                   | X98 | BUDGET CHANGE W/IN AGENCY  | B |

```
SELECT CHANGE NO. ==>
PF KEYS: 1-RECORD SEL   2-DATA SEL  3-NOT USED  4-PREV  PAGE   5-NEXT PAGE
REASON TYPE LEGEND:   B=BUDGET    T=TITLE   M=METHOD   L=LEAVE   X=TRANSFER
```

```
PQR150      ·      CITY OF NEW YORK                    DATE 01/02/07
            ·      PAYROLL MANAGEMENT SYSTEM           TIME: 14:51:24
                *** RECORD CHANGE HISTORY ***

SOC SEC NO: 101 68 4885      EMP NAME:    GIBBON        CLIFTON        G
PAY NO:      841             JOB SEQ#:    1             CURR LV STAT: A
EFF DATE:    01/02/07
                    RSN TYPE
CHG NO  EFF DATE   B T M L X   RSN CD    ----------DESCRIPTION---------  LV STAT
  01    05/05/02   - - - -      Z99      ERROR CORRECTION CODE              B
  02    03/17/02   - - - -      A92      LABOR CLASS APPOINTMENT            B
  03    12/15/01        -       O08      TERMINATE NON-PERMANENT            A
  04    04/08/01   - - -        A92      LABOR CLASS APPOINTMENT            B
        04/08/01          -     Z98      CITY START DATE CHANGE             B




SELECT CHANGE NO. ==>
PF KEYS: 1-RECORD SEL    2-DATA SEL  3-NOT USED  4-PREV  PAGE    5-NEXT PAGE
REASON TYPE LEGEND:    B=BUDGET    T=TITLE    M=METHOD    L=LEAVE    X=TRANSFER
```

EXHIBIT D

## Memorandum of Agreement
### Seasonal Appointments to ACHR Positions

Memorandum of Agreement (the "Agreement") entered into this _16_ day of _December_, 1997, by and between District Council 37, American Federation of State, County, and Municipal Employees, AFL-CIO on behalf of its affiliated Local 983 (the "Union"); and The City of New York (the "Employer").

## WHEREAS

**WHEREAS,** the New York City Department of Transportation ("DOT") desires to make seasonal appointments to the title of Assistant City Highway Repairer ("ACHR") for the period of the highway paving season which is chargeable to the City's Capital Budget ("IFA paving season"); and

**WHEREAS,** the Employer and the Union have reached certain understandings and agreements and wish to reduce the results thereof to writing;

**NOW, THEREFORE,** it is mutually agreed as follows:

§1.   This Agreement shall be limited to employees who during the term of this Agreement are appointed on a seasonal basis to the title of ACHR.

§2.   **Extended Health Plan Coverage:**

   a.   During the term of this Agreement, ACHRs who are appointed to seasonal positions for the IFA paving season and who are terminated at the end of the season because of the conclusion of their seasonal appointment, shall be entitled to continued basic health plan coverage for a period not to exceed ninety (90) days commencing the day after the date of their termination, provided that they were covered under the New York City Employee Health Benefits Program on the date of such seasonal termination. Such continued basic health plan coverage shall be contingent upon the funding provisions set forth in 2(b).

   b.   Effective with the calendar year 2000 paving season, the continued basic off-season health plan coverage set forth in §2(a) shall be funded by pro-rata deductions from the paychecks of the enrolled seasonal ACHRs who work during the IFA paving season. The amount of the additional pro-rata deductions shall be determined by the health plan selected by the individual employee. It is understood that the ACHR is solely responsible for the entire cost of the off-season health plan coverage and any future increases in the cost of the coverage. The premiums for the estimated seven bi-weekly pay periods of off-season health plan coverage shall be pro-rated over the remaining nineteen bi-weekly pay periods.

EOC00070

3.  a.   Seasonal ACHRs who are terminated at the end of the IFA paving season shall have preference over new hires in filling vacancies to seasonal positions in the next IFA paving season. Seasonal ACHRs shall have preference in filling full-time ACHR and Debris Remover positions in DOT. Any ACHR who has been seasonally employed for five (5) successive IFA paving seasons shall be converted full-time status in the ACHR title either at the beginning of the next successive IFA paving season or, if originally appointed after July 1st, on the employee's anniversary date in the next successive IFA paving season.

   b.   ACHRs, on the date of their termination, shall receive, in a lump sum, the cash value of any annual or non-FLSA compensatory leave balances remaining on the date of their termination.

4   Right of Review:

    a.   First Season Employees:

        i.    For purposes of this Agreement, the first season of seasonal service shall be deemed a probationary period.

        ii.   At anytime during, or at the end of the IFA paving season, DOT shall notify in writing any seasonal employee whose service during his/her first season has been found to be unsatisfactory.

        iii.  Any seasonal whose service during his/her first season has been found to be unsatisfactory shall be ineligible for future appointment to a seasonal position.

        iv.  Seasonal employees whose service during their first season has been found to be unsatisfactory shall be ineligible to receive the continued basic health care benefits and instead shall receive, in a lump sum, any annual leave or non-FLSA compensatory leave balances remaining on the date of their termination.

        v.   A review of the determination that an employee's service was unsatisfactory may be requested in writing by the employee or the employee's representative within one week of the employee's receipt of the notice. The decision of the DOT Commissioner or the Commissioner's designated representative shall be final, binding, and not subject to the grievance procedure or arbitration.

    b.   Employees With Less Than Three Years of Seasonal Service:

In any case involving an employee who has not completed three (3) *consecutive* seasons but has completed more than one (1) year of consecutive seasonal service, and who has had written charges of incompetency or misconduct served upon him or her the following procedure shall govern:

**STEP A**    Following the service of written charges, a conference with such employee shall be held with respect to such charges by the person designated by the DOT Commissioner to review grievances at Step I of the Grievance Procedure. The employee may be represented at such conference by a representative of the Union. The person designated by the Commissioner to review the charges shall take any steps necessary to a proper disposition of the charges and shall issue a decision in writing by the end of the fifth day following the date of the conference.

**STEP B**    If the employee is not satisfied with the determination at STEP A above, an appeal from such decision shall be made to the DOT Commissioner or the Commissioner's designated representative. The appeal must be made in writing within five (5) working days of the receipt of the decision. The Commissioner or the Commissioner's representative shall meet with the employee and the Union for review of the appeal and shall issue a decision in writing by the end of the tenth (10) working day following the day on which the appeal was filed. The Commissioner or the Commissioner's representative shall have the power to impose the disciplinary penalty, if any, decided upon, up to and including termination of employment.

EOC00071

**STEP C**    If the employee is not satisfied with the decision at STEP B above, the *Union* may appeal to the Commissioner of Labor Relations in writing within ten (10) working days of the determination of the DOT Commissioner or the DOT Commissioner's designated representative. The Commissioner of Labor Relations or the Commissioner's designated representative shall review the appeal and issue a written reply to the Union which shall be final, binding, and not subject to the grievance procedure or arbitration.

c.    **Employees With More Than Three Years of Seasonal Service:**

In any case involving an employee who has been employed for at least three (3) *consecutive* seasons as a seasonal ACHR and who has had written charges of incompetency or misconduct served upon him or her the following procedure shall govern:

**STEP A**    Following the service of written charges, a conference with such employee shall be held with respect to such charges by the person designated by the DOT Commissioner to review grievances at Step I of the Grievance Procedure. The employee may be represented at such conference by a representative of the Union. The person designated by the Commissioner to review the charges shall take any steps necessary to a proper disposition of the charges and shall issue a decision in writing by the end of the fifth day following the date of the conference.

**STEP B**    If the employee is not satisfied with the determination at STEP A above, an appeal from such decision shall be made to the DOT Commissioner or the Commissioner's designated representative. The appeal must be made in writing within five (5) working days of the receipt of the decision. The Commissioner or the Commissioner's representative shall meet with the employee and the Union for review of the appeal and shall issue a decision in writing by the end of the tenth (10) working day following the day on which the appeal was filed. The Commissioner or the Commissioner's representative shall have the power to impose the disciplinary penalty, if any, decided upon, up to and including termination of employment.

**STEP C**    If the employee is not satisfied with the decision at STEP B above, the employee or the Union may appeal to the Commissioner of Labor Relations in writing within ten (10) working days of the decision of the DOT Commissioner or the DOT Commissioner's designated representative. The Commissioner of Labor Relations or the Commissioner's designated representative shall issue a decision in writing within fifteen (15) working days of the receipt of the appeal.

**STEP D**    If the employee is not satisfied with the decision of the Commissioner of Labor Relations the *Union* with the consent of the employee may proceed to arbitration pursuant to the and procedures of the Office of Collective Bargaining.

d.    The provisions set forth in this Section 4 shall apply solely to ACHRs appointed as seasonal employees during the IFA paving season. Rights granted pursuant to these provisions shall be limited to an employee's status as a seasonal appointee as set forth in this Agreement and neither add to or subtract from any other rights to which such employee may be entitled.

5.    For the purpose of the job security provisions of the 1990-92 Citywide Agreement or successor agreements thereto, seasonal ACHRs shall be deemed to be "probationary employees."

EOC00072

6.    **Labor Management Committee:**

a.    A labor/management committee shall be established to resolve implementation issues and to monitor compliance with this Agreement.

b.    The parties agree to refer the discussion of procedures for reassignment and transfers to the labor/management committee.

7.    The parties agree that all provisions of the respective collective bargaining agreements remain in effect except as modified by this Agreement.

8.    If any of the provisions of this Agreement are found to be in conflict with the civil service law, or any other applicable rules and regulations, it is understood by the parties that civil service law, or the applicable rules and regulations, shall govern. Such conflict shall not impair the validity and enforceability of the remaining provisions of this letter agreement.

9.    Nothing contained herein shall limit or diminish the Employer's or the Union's rights pursuant to 12-307(b) of the New York City Collective Bargaining Law, except as specifically provided herein.

10.   The provisions of this Agreement may be modified by the mutual written consent of the

EOC00073

parties.

11.   This Agreement shall be deemed an appendix to the 1995-2000 Blue Collar Agreement pursuant to Article XIII thereof, and to shall be coterminous with said agreement.

**WHEREAS,** we have hereunto set our hands and seals this _16_ day of _December_ , 199 _9_.

**FOR THE CITY OF NEW YORK:**          **FOR THE UNION:**

By: _James F. Hanley_          By: _Lee Saunders_

JAMES F. HANLEY          LEE SAUNDERS

Commissioner of Labor Relations          Executive Director, DC-37 AFSCME, AFL-CIO

By: _Denise Sullivan_

EOC00069

EXHIBIT E

LABOR - XI                                                    CODE NO.  90692

# ASSISTANT  CITY  HIGHWAY  REPAIRER

## General Statement of Duties and Responsibilities

Under close supervision, assists in highway repair work;  performs related work.

## Examples of Typical Tasks

Performs general laboring tasks while assisting in the repair of curbs, sidewalks, and manhole edges and in the replacement of defective patches.

Performs such tasks as carrying of cement bags, shoveling of sand  and/or  stone, and mixing of materials while assisting in the laying of concrete;  sheet asphalt and other kinds of pavement.

Cleans construction and repair sites by the sweeping and removal of debris.

Performs general laboring tasks while assisting in foundation laying, and in the installation of shoring and sheeting for road depressions and excavations.

Assists in the operation of portable or towed power equipment and attachments required for maintenance operations.

Lays out and cares for tools required for maintenance and repair operations.

Assists in the loading and unloading of materials, equipment and other items.

Assists in the performance of general laboring work, such as snow removal, when weather conditions do not permit paving operations.

R  04.03.1991                           PAGE  1  OF  3

**LABOR - XI**                                                    **CODE NO.  90692**

## ASSISTANT CITY HIGHWAY REPAIRER  (continued)

**Examples of Typical Tasks**  (continued)

Assists in general vehicle maintenance which includes checks of oil and fuel levels, lights, horns and brakes;  cleans interior and exterior of vehicles when required.

Performs general laboring tasks as directed by the supervisor.

May assist in masonry work by the placing of forms during sidewalk and other concrete construction and repair work.

May use picks  and/or other equipment in the cleaning and preparing of defective areas for patching.

May operate a motorized vehicle in maintenance operations.

May be required to safely direct traffic around large construction projects.

**Qualification  Requirements**

1.    There are no formal education or experience requirements for this position.

2.    There are certain medical and physical requirements.

R  04.03.1991                        **PAGE  2  OF  3**

LABOR - XI                                    CODE NO.  90692

### ASSISTANT CITY HIGHWAY REPAIRER  (continued)


### License Requirement

A Driver License valid in the State of New York is required at the time of appointment. A Class B Commercial Driver License is required within ninety days of the date of appointment.  There may be certain age requirements to obtain this license.


### Lines of Promotion

**None.**        This class of positions is classified in the Labor Class.

EXHIBIT F

**NEW YORK CITY DEPARTMENT OF TRANSPORTATION
CONTROLLED SUBSTANCE AND ALCOHOL ABUSE POLICY FOR
HOLDERS OF A COMMERCIAL DRIVER'S LICENSE ("CDL")**

**REVISED SEPTEMBER 23, 2004**

**THIS POLICY SUPERSEDES ALL PREVIOUS DRUG AND ALCOHOL
TESTING POLICIES.**

## I.

## PROGRAM OVERVIEW

The New York City Department of Transportation ("DOT") is dedicated to providing a safe working environment for its employees and to improve the safety of the public that it serves. In meeting these goals, it is DOT's policy to (1) take steps to ensure that employees are not impaired in their ability to perform assigned duties in a safe, productive, and healthful manner; (2) create a workplace environment free from the adverse effects of drug and alcohol use; (3) prohibit the unlawful manufacture, distribution, dispensing, possession, or use of controlled substances; and (4) alert employees about programs available for employees whose personal problems, including alcohol or drug dependence, adversely affect their ability to perform their duties. This DOT Controlled Substance and Alcohol Abuse Policy Statement is based on the requirements of the U.S. Department of Transportation (USDOT) and the Federal Motor Carrier Safety Administration (FMCSA).

In response to passage of the Omnibus Transportation Employee Testing Act of 1991 the FMCSA has published regulations prohibiting drug use and alcohol misuse by employees (hereinafter referred to as "covered employees") who hold a **commercial driver's license ("CDL")** and perform safety-sensitive tasks as part of their routine and emergency duties and requiring employers of covered employees to test for prohibited drug use and alcohol misuse. These regulations are found at 49 CFR Part 382. In addition, the USDOT has issued 49 CFR Part 40, "Procedures for Transportation Workplace Drug and Alcohol Testing Programs", which prescribes testing methods to be followed.

EOC00139

1

## II.

## SAFETY SENSITIVE EMPLOYEES

The FMCSA regulations (49 CFR Part 382.101 et seq.) require drug and alcohol testing of employees who perform safety sensitive functions who: (1) hold a commercial driver's license; **and** (2) are in a job title the specifications of which require the operation of a commercial motor vehicle, which is defined as follows:

a motor vehicle or combination of motor vehicles used in commerce to transport passengers or property if the vehicle

(1) has a gross combination weight rating of 26,001 or more pounds; or

(2) has a great gross vehicle weight rating of 26,001 or more pounds; or

(3) is designed to transport 16 or more passengers, including the driver; or

(4) is of any size and is used in the transportation of materials found to be hazardous for the purposes of the Federal Materials Transportation Act (49 U.S.C. 5103(b)) and which require the motor vehicle to be placarded under the Hazardous Materials Regulations (49 CFR Part 172, subpart F).

**Safety sensitive functions include job related activities from the time a driver begins to work or is required to be ready to work until the time he or she is relieved from work.**

DOT has determined that the following job titles are safety sensitive under the FMCSA regulations and therefore employees working in these titles ("covered employees") are required to comply with the drug and alcohol testing provisions of the FMCSA:

**Area Supervisor Highway Maintenance, Assistant City Highway Repairer, Auto Mechanic, Auto Mechanic (Diesel), Bricklayer, Bridge Painter, Bridge Repairer and Riveter, Climber and Pruner, Gasoline Roller Engineer, Highway Repairer, Motor Grader Operator, Oiler, Supervisor Bridge Painter, Supervisor Highway Repairer, Supervisor of Mechanics (Mechanical Equipment), Tractor Operator, Traffic Device Maintainer.**

EOC00140

In addition any DOT employees who are not employed in these titles but, nonetheless, hold a CDL and operate a commercial motor vehicle as part of their work assignments are required to be tested under this policy statement and are defined as covered employees.

## III.

## PARTICIPATION AS A CONDITION FOR EMPLOYMENT

All covered employees who may perform the above-referenced safety-sensitive functions must participate in the drug and alcohol testing program described in this policy as a condition of employment.

## IV.

## PROHIBITED BEHAVIOR

### A. Drug Use

1.   **Controlled Substances**  No covered employee shall report for duty or remain on duty requiring the performance of a safety sensitive function when using any of the following controlled substances: (a) marijuana and its derivatives; (b) cocaine and its derivatives; (c) amphetamines; (d) opiates; and (e) phencyclidine (PCP), except when the use is pursuant to the instructions of a licensed physician who is authorized to prescribe controlled substances and other drugs and has advised the covered employee that the substance will not adversely affect the employee's ability to safely operate a motor vehicle.  Covered employees under DOT's policy will have a specimen of their urine tested for the presence of the five (5) controlled substances referenced above under the circumstances described in Part V of this policy statement.

   No covered employee shall report for duty, remain on duty or perform a safety sensitive function, if the employee tests positive or has adulterated or substituted a test specimen for controlled substances or refuses to submit to a drug and/or alcohol test as described in Part IV(C) of this policy statement.

2.   **Legal Drugs**   It is always advisable both for the safety of employees and the public for covered employees who take legally prescribed or over the counter drugs to consult with a licensed physician or dentist to determine if the ingestion or injection of such medications will impair their ability to perform safety sensitive functions.

### B. Alcohol Use

1.   Covered employees are prohibited from reporting for duty or remaining on duty while having an alcohol concentration of 0.04 or greater.

3

EOC00141

2.    Covered employees are prohibited from using alcohol while on duty.

3.    Covered employees are prohibited from reporting for duty within four (4) hours after using alcohol.

4.    No covered employee required to take a post accident test as described in Part V of this policy statement shall use alcohol for eight (8) hours following an accident, or until he/she undergoes a post-accident test, whichever occurs first.

5.    A covered employee found to have an alcohol concentration of 0.02 or greater but less than 0.04 shall be removed from duty until the start of the covered employee's next scheduled work period, but not less than 24 hours following the administration of an alcohol test.

## C. Refusal to Take a Drug or Alcohol Test

Pursuant to 49 CFR Parts 40.191 and 40.261 a refusal to take a drug or alcohol test occurs when a covered employee:

1.    fails to appear for a random, reasonable suspicion, post-accident, follow up or return to duty drug or alcohol test within a reasonable time after being directed to do so;

2.    fails to remain at the testing site for a random, reasonable suspicion, post-accident, follow up or return to duty drug or alcohol test until the testing process is complete;

3.    fails to provide a urine specimen for a drug test or breath for an alcohol test;

4.    fails to provide a sufficient amount of urine for drug testing or breath for alcohol testing and it has been determined by the Medical Review Officer ("MRO") that there is no adequate medical explanation for such failure. A valid medical explanation means that a determination has been made after the individual has been examined by an appropriate medical practitioner approved by DOT's MRO and the MRO provides a written conclusion that the inability to provide an adequate urine or breath specimen could, with a high probability, be due to a medical condition;

5.    fails to undergo a required medical examination or evaluation to determine if an employee has an adequate medical explanation as defined above;

6.    in the case of a directly observed or monitored drug test collection fails to permit the observation or monitoring of the provision of a specimen;

7.    in the case of a drug test fails or declines to take an additional drug test that DOT or the collector has directed him/her to take;

EOC00142

4

8.    in the case of an alcohol test fails to sign the certification at Step 2 of the Alcohol Testing Form;

9.    fails to cooperate with any part of the drug or alcohol testing process which shall include, but is not limited to, adulterating a specimen or substituting a specimen.

If any of the above occurs, the individual will be removed from duty and may be suspended, terminated or referred to a Substance Abuse Professional ("SAP") (see Part VII of this policy statement). **A refusal to test shall be deemed a positive drug and/or alcohol test result.**

## V.

## CIRCUMSTANCES FOR TESTING

Covered employees are subject to pre-employment, reasonable cause/suspicion, post-accident and random testing and, where applicable (see Part VII), return to duty and follow up testing. All testing requirements must meet the standards as outlined in the appropriate regulations. **Covered employees will be required to remain at the testing site beyond the scheduled end of their shifts in order to complete the testing process if necessary.**

### 1. Pre-Employment Drug Testing

a)    An applicant for a position requiring the possession of a CDL will not be hired by DOT unless the applicant takes a drug test with a verified negative result.

b)    An employee may not transfer from a non-safety-sensitive function to a position requiring the possession of a CDL until the employee takes a drug test with a verified negative result.

c)    If an applicant's/transferee's drug test is canceled through no fault of the applicant/transferee, the applicant/transferee is required to take a re-scheduled pre-employment drug test.

### 2. Reasonable Cause/Suspicion Testing

a)    Both drug and alcohol tests shall be conducted when there is reasonable cause/suspicion to believe that a covered employee exhibits symptoms of having used a prohibited drug and/or engaged in the misuse of alcohol.

b)    DOT's determination that reasonable suspicion exists shall be based on specific, contemporaneous, articulable observations concerning the appearance, behavior, speech, performance indicators, or body odors of the covered employee made by a supervisor or DOT official who has received training pursuant to 49 CFR Part 382.603. **Supervisors, or other DOT officials who have received training pursuant to 49 CFR Part 382.603, are instructed, upon discovering or**

5

EOC00143

receiving credible information that a covered employee is engaged in behavior prohibited under this policy (See Part IV of this policy), to ensure observations are made of the affected employee to determine whether the employee is exhibiting behavior consistent with drug use or alcohol abuse.

c)  An alcohol test based on reasonable suspicion may be administered when said suspicion occurs while a covered employee is performing safety sensitive functions, before the employee may be called upon to perform a safety sensitive function or just after the employee has ceased performing such functions.

d)  A reasonable suspicion drug test may be conducted any time while a covered employee is on duty.

### 3. Post-Accident Testing

a)  *Fatal Accidents:* As soon as practicable following an accident involving a commercial motor vehicle, DOT shall administer drug and alcohol tests to each of its surviving drivers involved in the accident if the accident involved the loss of human life.

b)  *Non-Fatal Accidents:* As soon as practicable following an accident involving a commercial motor vehicle, DOT shall administer drug and alcohol tests to each of its drivers who were performing safety sensitive functions and received a citation for a moving traffic violation arising from the accident if the accident involved: (1) bodily injury to any  person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or (2) one or more of the vehicles incurred disabling damage  as a result of the accident, requiring the motor vehicle to be transported away  from the scene by a tow truck or other motor vehicle.   **The citation must have been received within eight (8) hours of the occurrence for the purpose of alcohol testing and within 32 hours following the occurrence for the purposes of drug testing.  DOT shall make reasonable efforts to administer the drug and alcohol tests immediately following the issuance of a citation for a moving traffic violation.**

c)  DOT shall ensure that a covered employee required to be drug and alcohol tested under this section is tested as soon as practicable but no later than eight (8) hours after the accident for alcohol and no later than 32 hours after the accident for drugs.

d)   A covered employee who is subject to post-accident testing who fails to remain readily available for such testing, including notifying the employer or the employer representative of his or her location if he or she leaves the scene of the accident prior to submission to such test, may be deemed to have refused to submit to testing.

e)  Nothing in this section shall be construed to require the delay of necessary medical attention for the injured following an accident or to prohibit a covered

EOC00144

employee from leaving the scene of an accident for the period necessary to obtain assistance in responding to the accident or to obtain necessary emergency medical care.

## 4. Random Testing

a) Covered employees will be, at various times, randomly selected for unannounced drug and alcohol testing. Such testing may be conducted at the beginning of, during, or after a covered employee's work shift.

b) The dates for administering unannounced testing of randomly selected employees will be spread reasonably throughout the calendar year.

c) Each covered employee will be in a pool from which random selection is made.

d) Each covered employee in the pool shall have an equal chance of selection and will remain in the pool, whether or not the employee is ever tested.

e) A covered employee may be randomly tested for alcohol while the employee is performing safety sensitive functions, before the employee may be called upon to perform a safety sensitive function, or just after the employee has ceased performing such functions.

f) A covered employee may be randomly tested for drugs any time the employee is on duty.

g) The number of random drug and alcohol tests administered on an annual basis shall be equal to 100% of the number of covered employees in the random drug and alcohol testing pool.

## 5. Return to duty testing

If required under this policy (see Part VII), before returning to duty each covered employee who has received a verified positive drug or alcohol test result must do the following:

a) Be evaluated by DOT's designated certified Substance Abuse Professional ("SAP") and comply with the SAP's recommendations and/or requirements, including participation in any rehabilitation program or other treatment, as deemed appropriate by the SAP;

b) Have a negative drug test result and/or an alcohol test result with an alcohol concentration of less than 0.02 after notification by the SAP to DOT's Designated Employer Representative ("DER") that the covered employee has successfully complied with the recommended treatment and rehabilitation program.

EOC00145

7

### 6. Follow-up testing

Each covered employee who returns to duty after a required evaluation (see Part VII (4)) made by the SAP is subject to unannounced follow-up drug and/or alcohol testing. The designated SAP will determine the frequency and duration of follow-up testing. The covered employee will be required to take a minimum of six follow-up drug and/or alcohol tests with verified negative results during the first 12 months. After that period of time, the designated SAP will recommend the frequency and duration of follow-up drug and/or alcohol testing, provided that the follow-up testing period ends 60 months after the employee returns to duty. This testing shall be in addition to any random drug or alcohol testing.

## VI.

## <u>TESTING PROCEDURES</u>

All drug testing under this policy shall be conducted in a manner to ensure a high degree of accuracy and reliability and using techniques, equipment, and laboratory facilities that have been approved by the U.S. Department of Health and Human Services (DHHS). All testing will be conducted consistent with the procedures put forth in 49 CFR Part 40, as amended and shall include specimen validity testing.

Specimen validity testing is the evaluation of the specimen to determine if it is consistent with normal human urine. The purpose of validity testing is to determine whether certain adulterants or foreign substances were added to the urine, if the urine was diluted, or if the specimen was substituted.

The drugs that will be tested for include marijuana, cocaine, opiates, amphetamines, and phencyclidine. An initial drug screen will be conducted on each urine specimen. For those specimens that are not negative, a confirmatory Gas Chromatography/Mass Spectometry (GC/MS) test will be performed. The test will be considered positive if the amounts present are above the minimum thresholds established in 49 CFR Part 40, as amended.

All drug testing laboratory results will only be released to and reviewed by a qualified Medical Review Officer (MRO) in order to verify and validate test results. The MRO will release findings only to DOT's Designated Employer Representative (DER). The MRO shall be a licensed physician who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's confirmed positive test result. Before verifying that a covered employee has a positive test result, the MRO is responsible for contacting any such employee, on a direct and confidential basis, to determine whether the employee wishes to discuss the test or present a legitimate explanation for the positive result. An MRO staff person may make the initial contact. If, after reasonable efforts, the MRO is unable to reach the covered employee directly, the MRO may contact DOT's DER for assistance in contacting the employee. DOT's DER will take precautions to preserve the confidentiality to the MRO contact.

**EOC00146**

8

If, after making diligent and reasonable efforts, neither the MRO nor DOT's DER are able to contact the employee within ten (10) days of the date the MRO received the confirmed positive test result from the laboratory, the MRO may verify the test result as positive. The MRO may also verify the test result as positive if the employee does not contact the MRO within three (3) days of being contacted by DOT's DER or the employee expressly declines the opportunity to discuss the test result. The MRO may reopen the verification of a positive test if the employee presents documentation of serious injury or illness or other circumstances that unavoidably prevented the employee from being contacted within the designated time period, and if the employee then presents a legitimate (in the MRO's opinion) explanation for the positive test, the MRO shall declare the test to be negative.

The MRO will review and interpret an individual's medical history, including any medical records and biomedical information provided; afford the individual an opportunity to discuss the test result; and decide whether there is a legitimate medical explanation for the result, including legally prescribed medication.

The MRO can declare a test invalid or canceled based on the regulations specified in 49 CFR Part 40. A canceled/invalid test is considered neither a positive nor a negative test. An example of a canceled test is a urine sample being rejected by the laboratory. The MRO shall cancel the test and report the cancellation and the reasons for it to the FMCSA, DOT and the employee. A negative dilute specimen will require a retest.

If the MRO determines that an employee adulterated a specimen or provided a substitute specimen, the employee will be deemed to have refused to have taken the test and will be subject to the consequences described in Part VII of this policy statement.

Tests for breath alcohol concentration will be conducted utilizing a National Highway Traffic Safety Administration (NHTSA) approved evidential breath-testing device (EBT) operated by a trained breath alcohol technician (BAT).

All breath alcohol test results will be reported only by an MRO or BAT to DOT's Designated Employer Representative (DER). If the initial test indicates an alcohol concentration of 0.02 or greater, a second test will be performed to confirm the results of the initial test.

**A covered employee who has a confirmed alcohol concentration of greater than 0.02 but less than 0.04 will be removed from his/her position until the start of the covered employee's next scheduled work period, but not less than 24 hours following the administration of the alcohol test.**

An alcohol concentration of 0.04 or greater will be considered a positive alcohol test and in violation of this policy and a violation of the requirements set forth in 49 CFR Part 382 for safety sensitive employees.

EOC00147

Upon notification from the MRO that a covered employee has tested positive for drugs and/or alcohol, DOT shall immediately remove said employee from duty and shall seek the termination of said employee after a first positive result except for an employee in a job title described in Section VII (3) of this policy statement.

## Split Specimen Testing

A covered employee who questions the results of a required drug test under Part V of this policy may request that an additional test be conducted. This test must be conducted at a different DHHS-certified laboratory. The test must be conducted on the split sample that was provided by the employee at the same time as the original sample. All costs for such testing are paid by the employee unless the result of the split sample testing invalidates the result of the original test. The method of collecting, storing, and testing the split sample will be consistent with the procedures set forth in 49 CFR Part 40, as amended. **The employee's request for a split sample test must be made to the MRO within 72 hours of notice of the original sample verified test result. Requests made after 72 hours will only be accepted if the delay was due to documentable facts that were beyond the control of the employee.**

## VII.

## CONSEQUENCES OF THE USE OF DRUGS AND MISUSE OF ALCOHOL

1. If a covered employee has a verified positive drug test, or has a confirmed alcohol concentration of 0.04 or greater, or refuses to take a drug or alcohol test, the employee will immediately be removed from duty.

2. **Zero Tolerance Policy:** DOT shall seek the termination of **any** covered employee in the following job titles that require the possession of a CDL as a condition of employment, or who holds a CDL and operates a commercial motor vehicle, who receives a verified positive drug or alcohol test result.

**Auto Mechanic; Auto Mechanic (Diesel); Bricklayer; Bridge Painter; Bridge Repairer and Riveter; Gasoline Roller Engineer; Motor Grader Operator; Oiler; Supervisor Bridge Painter; Supervisor of Mechanics (Mechanical Equipment); Tractor Operator.** [1]

**This policy shall also apply to any DOT employees who are not employed in these titles but, nonetheless hold a CDL, and operate a commercial motor vehicle and are not covered by the Collective Bargaining Agreement between District Council 37 and the City of New York.**

A positive result shall include a refusal to test as defined under Part IV of this policy statement.

---

[1] Employees in these job titles are not covered by the City's Collective Bargaining Agreement with District Council 37 and are thus subject to termination after a positive drug or alcohol test.

EOC00148

Termination shall be sought pursuant to the procedural requirements of Section 75 of the New York State Civil Service Law and/or of the relevant collective bargaining agreement, where applicable. However, for probationary employees, provisional employees who have been employed for less than two years, provisional employees who are not covered by a collective bargaining agreement that contains disciplinary appeal rights and any other employees who do not have disciplinary appeal rights under Section 75 of the New York State Civil Service Law and/ or a collective bargaining agreement who are employed in the above job titles, termination shall be effective upon written notification by DOT after a verified positive drug and/or alcohol test. Covered employees terminated after a first time verified positive drug or alcohol test result shall not be referred by DOT to a DOT designated certified SAP or any other rehabilitation program and shall not be eligible for reinstatement. Upon termination, the employee will be notified of programs that address drug and alcohol addictions which the individual may contact at his/her own convenience.

3.      DOT shall seek the termination of any employee in the following job titles that require the possession of a CDL who receives a second verified positive drug and/or alcohol test result:[2]

**Area Supervisor Highway Maintenance; Assistant City Highway Repairer; Climber and Pruner; Highway Repairer; Supervisor Highway Repairer; Traffic Device Maintainer.**

**This policy shall also apply to any DOT employees who are not employed in these titles but, nonetheless hold a CDL, and operate a commercial motor vehicle and are covered by the Collective Bargaining Agreement between District Council 37 and the City of New York.**

A positive result shall include a refusal to test as defined under Part IV of this policy statement.

Termination shall be sought pursuant to the procedural requirements set forth in paragraph two (2) of this Part.

4.      Covered employees listed in paragraph three (3) of this Part who receive a first time positive drug and/or alcohol test result shall, except in compelling circumstances as determined by DOT, be offered the opportunity to participate in a substance abuse drug and alcohol counseling program. Employees who accept the offer will be referred to a designated certified SAP after a first time positive result for evaluation. The SAP will determine whether the employee is in need of assistance in resolving problems associated with drug use or misuse of alcohol. The SAP will also inform the employee of additional resources available for resolving problems associated with prohibited drug use and misuse of alcohol.

---

[2] The employees listed in this paragraph are covered by the collective bargaining agreement referenced in footnote 1.

EOC00149

5. DOT shall seek the termination of covered employees that either refuse the offer to participate in a substance abuse counseling and treatment program or where DOT makes a determination that there are compelling circumstances not to offer a covered employee this opportunity. Termination shall be sought pursuant to the procedural requirements set forth in paragraph two (2) of this Part.

6. Covered employees who are referred to a designated certified SAP shall comply with all treatment programs prescribed by the SAP before DOT shall consider permitting the employee to return to duty. If the SAP determines that the employee has successfully completed his/her treatment program and is fit to return to duty, DOT shall administer a return to duty drug and/or alcohol test. Only if the employee receives a verified negative drug test and/or alcohol test showing an alcohol concentration of below 0.02 shall DOT permit the employee to return to duty. In cases where the employee has not completed his/her treatment program but where the SAP has determined that said employee is in compliance with his/her treatment program and is fit to return to duty, DOT may permit the employee to return to duty upon receipt of a verified negative return to duty drug test and/or alcohol test result showing an alcohol concentration of below 0.02. Should such an employee, upon return to duty, fall out of compliance with his/her treatment program, DOT shall seek the employee's termination in accordance with the procedures set forth in paragraph two (2) of this part.

7. Once a covered employee receives a negative drug and/ or alcohol return to duty test result, said employee shall be subject to at least 6 unannounced follow up drug and/ or alcohol tests within the first 12 months following the employee's return to duty. This testing shall be in addition to random drug and alcohol testing.

8. **No provision in this policy statement shall preclude DOT from disciplining a covered employee listed under paragraph three (3) of this part in accordance with the procedural requirements set forth under paragraph two (2) of this Part, except that termination shall not be sought after a first time positive drug and/or alcohol test result for said employees absent compelling circumstances.**

## VIII.

## SIGNS AND EFFECTS OF ALCOHOL AND SUBSTANCE ABUSE

Substance abuse is the use of any chemical substance, legal or illegal, to the point that it produces physical, mental, emotional, and/or behavioral changes in the user. All controlled substances and non-prescription drugs chemically alter the mind, body functions, and motor skills, hindering judgment, perception, reaction time and all the other skills needed to perform safety-sensitive functions.

EOC00150

## ALCOHOL

Alcohol is a depressant and is considered a drug even though it is legal and publicly accepted. It is the most commonly abused drug and a major factor in at least 50 percent of all traffic fatalities.

## SIGNS

Slurred speech, glazed appearance of eyes, flushed skin, slowed reaction time, poor balance and odor on breath are all signs of alcohol use.

## EFFECTS

Alcohol slows down the central nervous system and brain functions, reduces coordination and reflex actions and impairs vision and perspective. While under the influence of alcohol, an individual's emotions can be distorted and intensified, leading to extreme reactions and loss of control.

## MARIJUANA

Marijuana is an illegal substance used for its intoxicating effects.

## SIGNS

Appearance of intoxication, bloodshot eyes, inability to maintain attention, and impaired time and distance perception are signs of marijuana use..

## EFFECTS

The use of marijuana can decrease motor skills and reaction time by up to 60 percent. An individual's thinking and reflexes are slowed, making it difficult to respond quickly to sudden or unexpected events. Marijuana can remain in the body for weeks.

## COCAINE

Cocaine, including "crack" cocaine, is a powerful stimulant and the most widely abused drug. It is an addictive drug leading to physical and psychological dependence.

## SIGNS

Extreme excitability, uncontrolled talkativeness and anxiety, dilated pupils, sniffles or runny nose, and paranoia are all signs of cocaine use.

EOC00151

13

## EFFECTS

The use of cocaine impairs motor coordination, vision and judgment. An individual under the influence of cocaine may overreact to minor traffic events or become overly confident and take inappropriate risks because of the user's inability to perceive danger.

## OPIATES

Narcotic analgesics are most commonly used medically to relieve pain. This group of drugs includes heroin, morphine, opium, codeine, methadone and meperidine.

## SIGNS

Drowsiness, constricted pupils, depressed reflexes, and poor coordination are signs of opiate use.

## EFFECTS

Use of opiates slows down the central nervous system and brain functions, reduces coordination and reflex actions and impairs vision and perspective. A user experiences a dream-like state of mind causing the individual to be inattentive and unable to react quickly.

## PHENCYCLIDINE (PCP/ANGEL DUST)

PCP is a synthetic drug once used by veterinarians, now illegally used as a hallucinogen.

## SIGNS

Signs of PCP use are extreme agitation, great physical strength, sweating, dizziness, confusion, loss of memory, hallucinations, and distortion of spatial distances.

## EFFECTS

A user of this drug is extremely dangerous on the road. The effects of this drug are varied; a user experiences a sense of power which may cause the user to take dangerous risks. The user becomes aggressive, hostile and fearless, even of death. Not only is vision impaired but auditory or visual hallucinations causing reaction to an event that is not occurring may be experienced.

## AMPHETAMINES

Amphetamines are a group of drugs that stimulate the central nervous system, increasing alertness and physical activity. Statistics show that drivers who use stimulants are more accident-prone.

EOC00152

*SIGNS*

Irritability, anxiety, dilated pupils, sweating, headaches, dizziness, restlessness, feeling of strength, and distorted thinking are signs of amphetamine use.

*EFFECTS*

The use of amphetamines impairs motor coordination, vision and judgment. A user tends to take more risks, may inappropriately increase vehicle speed and react inappropriately to minor irritations.

## IX.

## AGENCY CONTACT PERSONS

DOT employees who have questions regarding DOT's drug and alcohol testing program should contact:

Anna Budd
Designated Employer Representative ("DER")
New York City Department of Transportation
40 Worth Street, Rm. 815
New York, NY 10013
Tel. No.: (212) 442-7826    Fax: (212) 442-7834 e-mail: ABudd@dot.nyc.gov

Gordon Goldberg
Director of Labor Relations
New York City Department of Transportation
40 Worth Street, Room 810
New York, NY 10013
Tel. No.: (212) 442-1970    Fax: (212) 442-9208 e-mail: GGoldberg@dot.nyc.gov

Patricia Breglio
Director of Policy Analysis and Implementation
New York City Department of Transportation
40 Worth Street, Room 802
New York, NY 10013
Tel. No.: (212) 442-5404    Fax: (212)676-9585 e-mail: PBreglio@dot.nyc.gov

EOC00153

# X.

## DRUG AND ALCOHOL ABUSE COUNSELING

The following programs are available to assist you if you believe that you have a drug and/or alcohol abuse problem:

New York City Employee Assistance Program (EAP)
40 Rector Street, 7th Floor
New York, NY 10006
(212) 306-7660

DC37 Personal Services Unit
125 Barclay Street, Room 301
New York, NY 10007
(212) 815-1250
**(For Employees who are represented by DC37)**

Citywide CDL Employee Assistance Unit
44 Beaver Street
New York, NY 10004
(917) 237-5867

Inter-Group Association of Alcoholics Anonymous of New York, Inc.
307 Seventh Avenue, (West 28th Street), Room 201,
New York, N.Y. 10001-6007
PH: 212-647-1680; 718-515-8481; 914-949-1200
FX: 212-647-1648
Telecom Device For Deaf Only: 212-647-1649
Web Site: http://www.nyintergroup.org/

New York City Area Service Committee (NYCASC) of Narcotics Anonymous
POB #329
70-A Greenwich Avenue
New York, NY 10011
Regional Helpline: (212) 929-NANA (6262)
Web Site: http://www.nycasc.org/

EOC00154

EXHIBIT G

# NEW YORK CITY DEPARTMENT OF TRANSPORTATION

## CONFIRMATION OF RECEIPT

## ACKNOWLEDGEMENT

I have received a copy of the Department of Transportation's drug and alcohol policies and procedures.

_____
Date

_____
Employee's Signature

_____
Employee ID#

_____
Employee's Name

Please sign and return this document.

pp/drugtest/ackwldg

PER0113

EXHIBIT H

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

CLIFTON GIBBON,

                                             Plaintiff,

             -against-

CITY OF NEW YORK,

                                   Defendant.

------------------------------------------------------------------------ x

**DECLARATION OF RHAY
SUMLER IN SUPPORT OF
DEFENDANT'S MOTION
FOR SUMMARY
JUDGMENT**

07 CV 6698 (NRB)

      **RHAY SUMLER** declares pursuant to 28 U.S.C. § 1746, under penalty of perjury, that the following is true and correct.

      1.     I am Director of Field Operations for the New York City Department of Transportation ("NYCDOT") Drug and Alcohol Testing Program. I have held this position for approximately three years. I am fully familiar with the facts and circumstances set forth herein based upon a review of the books and records of the NYCDOT and conversations with its employees. As such, I submit this declaration in support of the motion by defendant, the City of New York, for Summary Judgment in this action.

      2.     Part of my responsibilities as Director of Field Operations for the NYCDOT is to ensure that our drug tests are conducted pursuant to the Federal Drug testing procedures set forth by the United States Department of Transportation ("U.S. DOT") in 49 CFR Part 40. Moreover, the Drug and Alcohol Testing Program maintains documents and records of individual drug tests, some of which are annexed hereto, in the course of its regularly conducted business activities related to drug testing and which are prepared at or near the time of the occurrence of the matters set forth in them.

3.      On February 15, 2006, I was the Designated Employer Representative ("DER") at 40 Worth Street for the employee drug tests being performed that morning.

4.      Plaintiff, Clifton Gibbon, a Seasonal Assistant City Highway Repairer whose job requires the possession and maintenance of a valid Class B Commercial Drivers License as a condition of employment, was scheduled to receive a pre-employment drug screening that morning prior to being reemployed for the 2006 employment season. His drug test began at approximately 9:18 am. A copy of the tester's statement is annexed hereto as Exhibit "1."

5.      Plaintiff did not make any requests for a new test day or time.

6.      Plaintiff's initial urine sample was less than 45ml and therefore it was insufficient pursuant to 49 CFR § 40.65(a).

7.      Pursuant to 49 CFR § 40.193(b)(1), plaintiff's insufficient urine sample was discarded. Then, pursuant to 49 CFR § 40.193(b)(2), plaintiff was told he had up to three hours to produce a sufficient urine sample.

8.      Plaintiff was given approximately 40 ounces of water and encouraged to drink it. See 49 CFR § 40.193(b)(2).

9.      Plaintiff was allowed to attempt to urinate whenever he wanted; however, he was told not to leave the designated testing area. Plaintiff continued to attempt to provide a sufficient urine sample; however none of his attempts were sufficient. See Exhibit "1;" 49 CFR § 40.65(a); and 49 CFR § 40.193(b)(1).

10.      It was explained to plaintiff that if he could not produce a sufficient urine sample within the three hours he would be referred to a physician for an examination to

determine whether plaintiff had a medical condition which would prevent him from providing a sufficient urine sample in a three hour period.

11.    It was also explained to plaintiff that if there was no adequate medical explanation to preclude him from providing a sufficient urine sample, plaintiff would then be determined to have refused to test, which was equivalent to a positive test and would then result in plaintiff not getting hired. See 49 CFR § 40.193.

12.    The three hour period ended and plaintiff did not yet provide a sufficient urine sample.

13.    Plaintiff was then told to go to a medical facility to be examined by the NYCDOT's drug testing Medical Review Officer ("MRO"). This examination was to evaluate the possible presence of an acceptable alternative medical explanation for plaintiff not providing a sufficient 45ml urine sample in three hours as required by U.S. DOT regulations.

14.    Plaintiff was given directions to Westchester Medical Care. A copy of these directions are annexed hereto as Exhibit "2."

15.    Based on the tests and examination conducted at Westchester Medical Care by the MRO, it was determined that no acceptable alternative medical explanation was discovered for plaintiff not providing a sufficient urine sample in three hours and that, therefore, the test was deemed a refusal to test under the U.S. DOT regulations.

I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  New York, New York
              May 14, 2008

                                   _____
                                   Rhay Sumler

-3-

Declaration of Rhay Sumler
Exhibit 1

11 West Main St.
Suite 300
Elmsford NY 10523



(914) 593-0300 Ph.
(914) 347-4901 Fax
www.claritytesting.com

## Tester Statement

On 2/15/06, I Lorenzo Robinson was performing Pre-employment Drug Testing for the New York City Department of Transportation on the 8th floor bathroom at 40 Worth Street New York, NY. At 9:18 AM I began a drug test on donor Clifton Gibbons. After confirming Mr. Gibbons ID, and explaining the testing procedures to him, donor was directed to the bathroom to provide a urine sample. Mr. Gibbon made a first attempt however the quantity was insufficient.

I explained to Mr. Gibbons that he was required to remain in the collection area and that he had up to 3 hours to provide a valid sample (45ml). Mr. Gibbons was provided water and subsequently made 2 additional attempts to provide a valid sample, however both were of insufficient quantity and discarded as required on 49 CFR Part 40.

I further explained to Mr. Gibbons that in the event that he was unable to provide a valid sample within a 3 hour starting from the time of his first attempt that he would be referred to a Physician for a medical evaluation to determine if valid medical condition existed that would prevent him providing a valid sample within a 3-hour period. Additionally, I made it clear that if the determination is that a valid medical condition did not exist that this would be a Refusal To Test, which carries the same consequences as a Positive test result. Mr. Gibbons understood what I explained to him and upon surpassing the 3-hour time limit without providing a valid sample he was willing to be evaluated by a Physician.

I communicated all of these details at the time of testing to Rhay Sumler, Designated Employer Representative ("DER") for NYC DOT who was at the testing site.

Lorenzo Robinson:

Declaration of Rhay Sumler
Exhibit 2

Driving Directions from Bayside, NY to 160 S Central Ave, Elmsford, NY



# MAPQUEST

**Start:** **Bayside, NY 11361, US**

**End:** **160 S Central Ave**
**Elmsford, NY 10523-3509, US**

**Notes:**
Fax to 1-212-676-9585

Westchester Medical Care 914-345-3135
(Same parking lot as Teamsters Local 456
bldg). Medical office entrance is at the far
right of bldg.

| Directions | Distance |
|---|---|
| **Total Est. Time: 35 minutes**     **Total Est. Distance: 25.58 miles** | |
| **1: Start out going SOUTH on 210TH ST toward 42ND AVE.** | <0.1 miles |
| **2: Turn RIGHT onto 42ND AVE.** | 0.1 miles |
| **3: Turn LEFT onto 208TH ST.** | 0.1 miles |
| **4: Turn RIGHT onto 43RD AVE.** | <0.1 miles |
| **5: Turn RIGHT onto CLEARVIEW EXPY.** | <0.1 miles |
| **6: Merge onto I-295 N via the ramp on the LEFT toward THROGS NECK BR (Portions toll).** | 4.9 miles |
| **7: Merge onto THROGS NECK EXPY / I-695 N via EXIT 10 toward I-95 N / NEW HAVEN.** | 1.6 miles |
| **8: THROGS NECK EXPY / I-695 N becomes I-95 N.** | 1.3 miles |
| **9: Take the HUTCHINSON PKWY NORTH exit- EXIT 9.** | <0.1 miles |
| **10: Merge onto HUTCHINSON RIVER PKWY N via the exit on the LEFT.** | 4.4 miles |
| **11: Merge onto CROSS COUNTY PKWY W via EXIT 13 toward SAW MILL PKWY / YONKERS.** | 1.6 miles |

Driving Directions from Bayside, NY to 160 S Central Ave, Elmsford, NY

| | 0.4 miles |
|---|---|
| 12: Take the BRONX PKWY NORTH exit- EXIT 6- toward SPRAIN PKWY. | |
| 13: Merge onto BRONX RIVER PKWY N. | 0.3 miles |
| 14: Take SPRAIN BROOK PKWY N toward TACONIC PKWY. | 9.0 miles |
| 15: Merge onto I-287 W / CROSS WESTCHESTER EXPY via the exit on the LEFT toward TAPPAN ZEE BR. | 0.3 miles |
| 16: Take the RT-9A exit- EXIT 2- toward ELMSFORD. | 0.1 miles |
| 17: Turn LEFT onto NY-9A / N SAW MILL RIVER RD. Continue to follow NY-9A. | 0.7 miles |
| 18: End at 160 S Central Ave Elmsford, NY 10523-3509, US | |

Total Est. Time: 35 minutes      Total Est. Distance: 25.58 miles

### Driving Directions from Bayside, NY to 160 S Central Ave, Elmsford, NY



**Start:**
**Bayside, NY 11361, US**

**End:**
**160 S Central Ave**
**Elmsford, NY 10523-3509, US**





All rights reserved. Use Subject to License/Copyright

These directions are informational only. No representation is made or warranty given as to their content, road conditions or route usability or expeditiousness. User assumes all risk of use. MapQuest and its suppliers assume no responsibility for any loss or delay resulting from such use.

EXHIBIT I

05/15/2006  11:25     914-345-3169                WESTCHESTER MEDICAL                    PAGE  04/09
02/16/2006  15:56     914-34_ _169              WESTCHESTER MEDI_              1-914-206-5444  From: Jeffrey Altholz MD

                                                                                              PAGE  11/14

# Westchester Medical Care, PLLC

Patient Name _Clifton Gibbon_          Age _55_  Date _2-17-06_

What is the reason for your visit today? _____ _NO_ _____

Is visit related to a work injury? _NO_  Is visit related to a car accident? _NO_

Has your insurance changed? _NO_  Has your address/phone changed? _NO_

---

BP ____  HR ____  Temp ____  LMP ____  Allergies _NKDA_ ____

2/17/06 - _Stacy  Bladder  Exam_   554.0 ♂ meds

BP 120/70   At here for evaluation, unable to
P: 120      produce urine specimen at recent drugtest.
H-5'6       Pt denies H/o renal dz.
W-210       Pt states he has seen his PCP last year
            who told him that his "prostate was        SMOKER
PMH         swollen" and that's why at times he        YES
HTN         cannot urinate. He was given a medication,
Hyperlipdemia  he cannot remember the name, for a short time.
            He says he has times when he feels like he
Meds        has to urinate, but the "urine just won't come out."
Norvasc     Other times he reports urinary incontinence.
Lipitor.
            Abd ⊕BS soft NT/ND
                ⊘CVA tend
ETOH rare,
     occ beer.  Rectal prostate smooth, slightly enlarged

⊘ drug use   Plan/ - UA
⊘ H/o DWI.        - BUP, PSA

            _Jeffrey Altholz_ MD    _MBon_ RPAC .

Jeffrey Altholz, MD        Michelle Bonamassa, RPA-C        Gary Lehrman, MD

MED0005

04/04/2006  14:27    914-345-3169          WESTCHESTER MEDICAL                    PAGE 02/02

212 676 9585

## LabCorp

LabCorp Raritan
69 First Avenue, Raritan, NJ 08869-0000

Phone: 908-526-2400

| SPECIMEN | TYPE | PRIMARY LAB | REPORT STATUS | Page #: | 1 |
|----------|------|-------------|---------------|---------|---|
| 043-042-3065-0 | S | RN | COMPLETE | | |

ADDITIONAL INFORMATION        SS#:

FASTING: N
PHONE: 718-423-0342  DOB: 8/05/1950

| PATIENT NAME | SEX | AGE(YR./MOS.) |
|--------------|-----|---------------|
| GIBBON, CLIFTON | M | 55 / 6 |

PT. ADD: 180 S. CENTRAL AVENUE

| Elmsford | NY | 10523-0000 |

| DATE OF COLLECTION TIME | DATE RECEIVED | DATE REPORTED | TIME | |
|------------------------|---------------|---------------|------|--|
| 2/17/2006    13:22 | 2/18/2006 | 2/18/2006 | 9:07 | 6338 |

### CLINICAL INFORMATION
CD- 10026205493

| PHYSICIAN ID. | PATIENT ID. |
|---------------|-------------|
| ALTHOLZ J | 101684885 |

ACCOUNT: JEFFREY ALTHOLZ MD (C)
CLINICAL ACCOUNT
180 S Central Ave

| Elmsford | NY | 10523-0000 |

ACCOUNT NUMBER:  31607850

| TEST | RESULT | | LIMITS | LAB |
|------|--------|--|--------|-----|
| Urinalysis, Routine | | | | RN |
| Urinalysis Gross Exam | | | | RN |
| Specific Gravity | 1.015 | | 1.005 - 1.030 | RN |
| pH | 7.0 | | 5.0 - 7.5 | RN |
| Urine-Color | Yellow | | Yellow | RN |
| Appearance | Clear | | Clear | RN |
| WBC Esterase | Negative | | Negative | RN |
| Protein | Negative | | Negative/Trace | RN |
| Glucose | Negative | | Negative | RN |
| Ketones | Negative | | Negative | RN |
| Occult Blood | Negative | | Negative | RN |
| Bilirubin | Negative | | Negative | RN |
| Urobilinogen,Semi-Qn | 1.0 | EU/dL | 0.0 - 1.9 | RN |
| Nitrite, Urine | Negative | | Negative | RN |
| Microscopic Examination | | | | RN |
| Microscopic follows if indicated. | | | | |
| Basic Metabolic Panel (8) | | | | RN |
| Glucose, Serum | 105 H | mg/dL | 65 - 99 | RN |
| BUN | 16 | mg/dL | 5 - 26 | RN |
| Creatinine, Serum | 1.3 | mg/dL | 0.5 - 1.5 | RN |
| BUN/Creatinine Ratio | 12 | | 8 - 27 | |
| Sodium, Serum | 138 | mmol/L | 135 - 148 | RN |
| Potassium, Serum | 3.9 | mmol/L | 3.5 - 5.5 | RN |
| Chloride, Serum | 98 | mmol/L | 96 - 109 | RN |
| Carbon Dioxide, Total | 26 | mmol/L | 20 - 32 | RN |
| Calcium, Serum | 10.3 | mg/dL | 8.5 - 10.6 | RN |
| Prostate Specific Ag, Serum | | | | |
| Prostate-Specific Ag, Serum | 1.8 | ng/mL | 0.0 - 4.0 | RN |

*NORMAL KIDNEY FUNCTION* (handwritten annotation pointing to BUN/Creatinine rows)

Beckman (formerly Hybritech) ICMA methodology.  Values obtained with
different assay methods or kits cannot be used interchangeably.
Results cannot be interpreted as absolute evidence of the presence or
absence of malignant disease.

LAB: RN LabCorp Raritan                    DIRECTOR: Irene Isaac V MD
69 First Avenue, Raritan, NJ 08869-0000

| Pat Name: GIBBON,CLIFTON | Pat ID: 101684885 | Spec #: 048-042-3065-0 | Seq #: 6338 |

Results are Flagged in Accordance with Age Dependent Reference Ranges
Last Page of Report

MED0007

EXHIBIT J



February 24, 2006

Re: CLIFTON GIBBON---SHY BLADDER EVALUATION

To: Anna Budd---NYC DOT

From: Jeffrey Altholz MD—*Certified, Medical Review Officer*

On February 17, 2006 Mr. Clifton Gibbon underwent Evaluation for Shy Bladder in compliance with 49 CFR Part 40.193, after not providing a urine specimen for drug testing.

Mr. Gibbon had a medical examination, a thorough medical and medication history and blood/urine tests at Westchester Medical Care PLLC in accordance with 49 CFR Part 40.193 to evaluate the possible presence of an acceptable alternative medical explanation for not providing a urine specimen as required when required for testing.

After review of all the clinical information, this test is deemed a *refusal to test* as no acceptable alternative medical explanation was discovered. As you know, a refusal to test is exactly equivalent to a positive test under Federal DOT regulations.

Please do not hesitate to call me with any questions or concerns you may have regarding this evaluation or the DOT regulations surrounding it.

Sincerely,

Jeffrey Altholz, MD
*Diplomate*, American Board of Internal Medicine
NYS License # 170767

MED0006

Clarity Testing Services, Inc. Result Letter



Clarity Testing Services Inc
56 Lafayette Ave
Suite 380
White Plains, NY 10603

## ATTENTION:

Anna Budd
Department Of Transportation NYC
40 Worth Street Room 810
New York, NY 10013

Home Base: Queens- Park Drive East
Participant: Clifton Gibbon
Participant ID: 769
SSN: 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

# Results of DOT Controlled Substance Test

Record Status: **REFUSED**
Test Type: Pre-Employment
Collection Date/Time: 02/15/2006
Batch_ID: 20060228
Specimen ID:
Date COC Received:

Laboratory:

Collection Site: Mobile Testing Unit
Job Site Location
Elmsford, NY 10523
Specimen Collector: Lorenzo Robinson

| Substance Tested | Result | Substance Tested | Result |
|---|---|---|---|
| Amphetamines | REFUSED | Cocaine | REFUSED |
| Marijuana | REFUSED | Phencyclidine | REFUSED |
| Opiates | REFUSED | | |

Donor underwent Evaluation for Shy Bladder on 2/17/06. After review the test was verified as a REFUSAL TO TEST.

This test was performed, recorded, and reported in accordance with CFR 49 Part 40.

Medical Review Officer: Jeffrey Altholz M.D.

Date Verified:   02/17/2006

EOC00108

EXHIBIT K



**New York City**
**Department of Transportation**

Iris Weinshall, Commissioner

Personnel Department
40 Worth Street, Room 801
New York, New York 10013
Tel: 212/442-6563
Fax: 212/442-6530

Web: www.nyc.gov/dot

March 10, 2006

RE:    Assistant City Highway Repairer
SSN:  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

## NOTICE OF MEDICAL DISQUALIFICATION

Dear Mr. Gibbons:

The following action has been taken concerning your proposed appointment to the above Position:

The Department of Transportation has found you NOT QUALIFIED for the following reasons:

    {X}    Medically:    See explanation below

    { }    Failed to complete Medical Examination

At your medical evaluation no legitimate medical condition was found that would have prevented production of a sufficient specimen. Pursuant to Federal regulations, your test result has been determined by our Medical Review Officer (MRO) to be a "refusal to test" which under the federal regulations carries the same consequences as a positive test result.

The above decision may be appealed in writing by your physician. If you wish to do so, you can contact the MRO by faxing the doctor's note to (914) 347-4901.

Very truly yours,

Jean Frankowski
Director of Personnel

EOC00110

DIAL 311 | Government Services & Information for NYC

EXHIBIT L

Attention
Joe. Pules

# QLI.
## QUEENS-LONG ISLAND MEDICAL GROUP, P.C.

3/8/06

To whom it may concern

Re - Mr Clifton Gibbon

This is to state Mr Clifton Gibbon
has benign prostatic hyperplasia
which causes problems with
urination. In case of any
questions. feel free to call
me @ 718 526 6300 ext 8019

Yours sincerely

M Bharara

M. BHARARA, M.D.
Lic. # 211683
DEA # BB6541836

PFR0006

EXHIBIT M



3/22/06

### QUEENS-LONG ISLAND MEDICAL GROUP, P.C.

To whom it may concern

Re Clifton G Gibbon

This is to state that Mr Clifton C Gibbon has BPH. Patient commenced on flomax 2/18/06 & patient is now able to urinate comfortably and take a drug test.

Yours Sincerely

M Bharara

M. BHARARA, M.D.
Lic. # 214683
DEA # BB6541836

000007

EXHIBIT N

# FAX COVER SHEET

| TO | Anna Budd |
|---|---|
| COMPANY | NYC DOT |
| FAX NUMBER | 12124427834 |
| FROM | Jeffrey Altholz, MD |
| DATE | 2006-03-23 14:44:19 CMT |
| RE | Gibbons Additioanl Data #2 |

## COVER MESSAGE

Dear Anna:

I have received an additional note dated 3/22/06 from Dr Bharara regarding medical information pertaining to Clifton Gibbons and his inability to provide a specimen for drug testing.

I have reviewed this information carefully and after consideration of the data contained in the letter, it does not change the prior conclusion that Mr. Gibbons test be deemed a refusal to test. Based on 49 CFR Part 40 guidelines, no valid medical explanation is being offered.

Please feel free to call with any questions.

Sincerely,

Jffrey Altholz MD

Certified Medical Review Officer
Diplomate, American Board of Internal Medicine

EOC00112

EXHIBIT O

**New York City**
**Department of Transportation**

Iris Weinshall, Commissioner

Personnel Department
40 Worth Street, Room 801
New York, New York 10013
Tel: 212/442-6563
Fax: 212/442-6530

Web:  www.nyc.gov/dot

March 31, 2006

Mr. Clifton Gibbon

Flushing, NY  11361

Dear Mr. Gibbon:

On February 17, 2006 you underwent a required medical evaluation in compliance with 49 CFR Part 40, after you failed to provide a urine specimen for drug testing on February 15, 2006.  The Medical Review Officer (MRO) reviewed all the clinical information and determined that your original failure to provide a specimen was a "refusal to test".  Under the Federal DOT regulations, this carries the same consequences as a positive test result.  On March 10, 2006 you were notified by letter that you were found medically "not qualified" for the position of Assistant City Highway Repairer because of this test result.

Subsequently, DOT received notice from the Medical Review Officer that additional medical information was forwarded to him by your physician.  DOT's MRO now states that he has considered the information and that it does not change the prior conclusion that your test be deemed a "refusal to test". Therefore, the prior determination of "not qualified" must stand.

Very truly yours,

Jean Frankowski
Director of Personnel

EOC00114

DIAL | Government Services
311 | & Information for NYC

EXHIBIT P



Queens-Long Island
Medical Group, P.C.
Caring for the community

06/16/06

To whom it may concern:

Re: Clifton G Gibbon
DOB: 08/06/50

Mr Gibbon was initially referred to me for evaluation of lower urinary tract symptoms which he described as urgency, frequency, hesitancy and weak flow of urine. These symptoms he reports present for about 6 months. He was given Flomax by his PCP (Dr. Bhorava) for a presumed enlarged prostate (BPH).

On exam the patient has a mildly enlarged prostate by rectal, however prostate volume can be determined by ultrasound.

The patient reports difficulty submitting a urine specimen when asked, each time, while not on Flomax.

I have asked the patient to restart Flomax and will proceed with Urodynamics if patient continues to have voiding dysfunction, in order to document either bladder outlet obstruction either due to BPH

000008

— over —



Queens-Long Island
Medical Group, P.C.
Caring for our community

—Continued—

Re: Clifton G Gibbon
DOB: 08/06/50

or poor bladder contractility.

At present I am unable to state why
Mr. Gibbon is unable to give a urine
specimen when requested. While he may
have BPH and Flomax is used to improve
his voiding habits and urinary flow, it
does not explain why he is unable to
submit a urine test when requested.

Thank you.

Marlon Cornejo, MD.

Jamaica Estates Medical Offices: 180-05 Hillside Avenue, Jamaica, NY 11432 • 718.526.6300 • Fax: 718.262.7045 • www.qlimg.com

000009

EXHIBIT Q

JUDGE BUCHWALD    07 CV    6698

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

CLIFTON GIBBON,                                    07 Civ.

      Plaintiff,

- against -                                        COMPLAINT

CITY OF NEW YORK,                                  PLAINTIFF DEMANDS
                                                   TRIAL BY JURY IN
      Defendant.                                 THIS ACTION

-------------------------------------------------------X

     Plaintiff Clifton Gibbon ("Gibbon"), by his attorneys, Schwartz, Lichten & Bright, P.C.,

complains of defendant City of New York, as follows:


### JURISDICTION AND VENUE

     1.  This is an action brought to remedy discrimination in employment on the basis of

disability, in violation of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C.

§ 12101 et seq. ("ADA"); the New York State Human Rights Law, Executive Law § 290 et seq.

("Human Rights Law"); and the Administrative Code of the City of New York, § 8-101 et seq.

("Administrative Code").

     2.  Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), and 1367,

and 42 U.S.C. § 12117(a).

     3.  Declaratory and injunctive relief, damages, and other appropriate legal and equitable relief

are sought pursuant to 42 U.S.C. § 12117(a).  Compensatory damages are sought pursuant to 42

U.S.C. § 1981a; Executive Law § 297(9); and Administrative Code, § 8-502(a). Punitive damages are sought pursuant to 42 U.S.C. § 1981a and Administrative Code, § 8-502(a).

4. Costs and attorney's fees are sought pursuant to 42 U.S.C. § 12117(a) and Administrative Code, § 8-502(f).

5. Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. § 1391(b), because the unlawful employment practices occurred within this judicial district.

6. Plaintiff filed a charge of discrimination against defendant with the U.S. Equal Employment Opportunity Commission ("EEOC") on November 21, 2006. The United States Department of Justice, on July 18, 2007, issued plaintiff a notice informing him of his right to sue defendant. Plaintiff has fully complied with all prerequisites to jurisdiction in this Court under the ADA.


PARTIES

7. Gibbon was employed by the New York City Department of Transportation ("DOT") as an Assistant City Highway Repairer ("ACHR") from March 2001 until his discharge on March 10, 2006.

8. DOT is a municipal department of defendant City of New York, with its headquarters at 40 Worth Street, New York, New York.

2

<u>FACTS</u>

9. Gibbon has been diagnosed with benign prostatic hyperplasia with acute urinary retention. One of the symptoms of Gibbon's condition is impairment of his ability to urinate. Gibbon is able to perform all of the functions of an ACHR.

10. On March 10, 2006, DOT notified Gibbon that the agency had "medically disqualified" Gibbon from his position as ACHR, effective immediately. On March 31, 2006, DOT advised Gibbon that his medical disqualification was due to Gibbon's inability to provide a urine specimen on February 17, 2006.

11. Gibbon was unable to provide a urine specimen because of his disability.

<u>FIRST CAUSE OF ACTION</u>

12. DOT discharged Gibbon because he has a physical impairment that substantially limits at least one major life activity, urination. Defendant therefore discriminated against plaintiff because of his disability. By its acts and practies described above, defendant has violated the ADA.

13. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer injury unless and until this Court grants relief. Defendant engaged in these discriminatory practices with malice and with reckless indifference to plaintiff's rights protected under federal law.

<u>SECOND CAUSE OF ACTION</u>

14. By its acts and practices described above, defendant has violated the Human Rights Law.

3

15. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until this Court grants relief. Defendant willfully and maliciously engaged in these discriminatory practices.

## THIRD CAUSE OF ACTION

16. By its acts and practices described above, defendant has violated the Administrative Code.

17. As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation unless and until this Court grants relief. Defendant willfully and maliciously engaged in these discriminatory practices.

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

## ON THE FIRST CAUSE OF ACTION

(a) declaring that the acts and practices complained of herein are in violation of the ADA;

(b) enjoining and permanently restraining these violations of the ADA;

(c) directing defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff's employment opportunities;

(d) directing defendant to place plaintiff in the position he would have continued to occupy but for defendant's discriminatory treatment of him, and make him whole for all earnings he would have received but for defendant's discriminatory treatment, including but not limited to wages, bonuses, pensions, and other lost benefits;

4

(e) directing defendant to pay plaintiff compensatory and punitive damages and damages for his mental anguish and humiliation;

(f) awarding plaintiff reasonable attorney's fees and the costs of this action;

(g) granting such other and further relief as this Court deems just and proper;

## ON THE SECOND CAUSE OF ACTION

(h) awarding compensatory damages in an amount not yet ascertained;

## ON THE THIRD CAUSE OF ACTION

(i) awarding compensatory and punitive damages in an amount not yet ascertained; and

(j) awarding plaintiff reasonable attorney's fees and costs of this action;

## DEMAND FOR A TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury on all of the causes of action herein.

Dated: New York, New York
       July 25, 2007

SCHWARTZ, LICHTEN & BRIGHT, P.C.

By: Stuart Lichten (SL-1258)
Attorneys for Plaintiff
275 Seventh Avenue - 17th Floor
New York, New York  10001
(212) 228-6320

5